IN THE SUPREME COURT
OF THE VIRGIN ISLANDS

**FILED**
April 02, 2024 01:00 PM
SCT-CIV-2018-0045
VERONICA HANDY, ESQUIRE
CLERK OF THE COURT

**For Publication**

# IN THE SUPREME COURT OF THE VIRGIN ISLANDS

| | | |
|---|---|---|
| **FRANKLYN O. VICTOR,** | ) | **S. Ct. Civ. No. 2018-0045** |
| Appellant/Defendant, | ) | Re: Super. Ct. Civ. No. 626/08 (STT) |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MONICA TODMAN,** | ) | |
| Appellee/Plaintiff. | ) | |
| | ) | |

On Appeal from the Superior Court of the Virgin Islands
Division of St. Thomas & St. John
Superior Court Judge: Hon. Kathleen MacKay

Considered: October 8, 2019
Filed: April 2, 2024

Cite as: 2024 VI 18

**BEFORE:** **RHYS S. HODGE,** Chief Justice; **IVE ARLINGTON SWAN,** Associate Justice; and **MARIA M. CABRET,** Associate Justice.

**APPEARANCES:**

**Francis E. Jackson, Jr., Esq.**
Law Offices of Francis E. Jackson, Jr.
St. Thomas, U.S.V.I.
    *Attorney for Appellant,*

**Judith L. Bourne, Esq.**
The Bourne Law Office, PLLC
St. Thomas, U.S.V.I.
    *Attorney for Appellee.*

## OPINION OF THE COURT

**SWAN, Associate Justice.**

¶1 Appellant, Franklyn O. Victor, seeks reversal of the February 21, 2018 judgment of the

Superior Court of the Virgin Islands ("Superior Court") awarding him a one-half undivided interest

in Parcel no. 278 Hospital Ground, St. Thomas ("278 Property" or "278"), arguing that he is

entitled to a larger share of the property and generally challenging the distribution of the property

ownership and mortgage liability between himself and Monica Todman, with whom he jointly

purchased the subject property in 2001. On her cross-appeal, Ms. Todman argues that appellant's

contention that the only evidence of Todman's claim of lack of intent to convey her interest in the

subject property to Victor via a 2003 quitclaim deed was her uncorroborated testimony is

misplaced. She further argues that she was not negligent in failing to have that quitclaim deed

read to her before she signed it, due in part to the relationship of confidentiality and trust that had

existed between them at the time. Lastly, she argues that appellant's contention that the Superior

Court should have equitably distributed the property on the basis of a current appraisal lacks a

legal basis, and that the Superior Court erred in failing to correct its finding that her interest in the

property was burdened by what would have been the entirety of the principal balance of the

mortgage affecting the property as of the date of trial, rather than only one-half of that principal

balance. For the reasons elucidated below, we affirm in part and vacate in part and remand the

case to the trial court for the taking of further evidence and further determination of the equitable

distribution of the 278 Property and the mortgage debt on that property.

## I.    BACKGROUND

¶2    On December 18, 2008, Appellee, Todman, filed a verified complaint in the Superior

Court.

### A. The Bench Trial

¶3    The bench trial commenced on May 26, 2016. Todman's first witness was Gerald Laurie.

Laurie resided on St. Thomas and had known Victor for approximately 24 years. Laurie and Victor

had met when they both lived on the island of Tortola in 1993 or 1994, and both being from

Guyana, they formed a friendship. It was during Laurie's residence on Tortola that he also came to know Todman, whom he understood to be Victor's spouse. While the specifics are unclear, Laurie's testimony supports certain conclusions. While living on Tortola, at the same time as Victor and Todman, Laurie and Victor established a friendship through which Laurie was introduced to Todman, though that acquaintance was insignificant. At some point after meeting Victor, Laurie returned to Guyana. While he lived there, Victor would visit Guyana, and Laurie would meet him upon his arrival. Starting in 2002 or 2003, Laurie assisted Victor in constructing a home in Guyana. In reviewing building plans during this time, Laurie noticed that Monica Todman was listed on a set of plans, and when asked about this, Victor explained that Todman was "his girl."

¶4      In 2005, during some of these conversations, Victor informed Laurie that he wished to "get rid of" Todman. During this return visit to Guyana, Victor explained that he told Todman that a document was necessary for him to obtain a bank loan and asked her to sign it. In actuality, it was a deed purporting to transfer to him Todman's interest in the 278 Property. In 2005, Victor likewise asked Laurie to come to St. Thomas and assist in building the home at 278. Laurie had experience in carpentry and electrical work; he lived with and worked for Victor from approximately 2005-2008.

¶5      During this time, many Guyanese people worked on the construction of the home. Approximately nine people were living with Victor, including—in addition to Todman and the children[1]—those working for him at the Hospital Ground property. Laurie explained that, during the time working for Victor, he worked "three years straight non-stop. Non-stop. Even Christmas

---

[1] This included the son Daryl Victor and Victor's nephews, Jamaine and Jamal.

day, holiday." "I try to help him as a friend, and secondly, I didn't had [sic] a choice. I didn't

[have] a choice. I had to do it." Laurie was never fully compensated for his three years of work,

but he also did not pay rent, though he was required to contribute to payment of the electrical and

gas bills. Indeed, Victor paid none of the Guyanese workers. When asked whether "this was

volunteer work," Laurie responded, "we had to work. We didn't [have] a choice. We didn't [have]

a choice."[2] Even when Victor took days off, Laurie would still work at the property. During cross-

examination, Laurie explained that he came to St. Thomas at the invitation of Victor, and Victor

"made everything possible for [Laurie] to get [to St. Thomas]." When Victor's counsel asked how

Victor assisted in this regard, Laurie responded by invoking his Fifth Amendment[3] right to remain

silent.

¶6     The trial court heard Laurie's description of the relationship between Todman and Victor

during that time and also heard Victor's description of the relationship. Todman would provide

food for the construction workers and did so for the three years Laurie worked for Victor. During

---

[2] During cross examination, Victor's counsel pressed Laurie on the issue of compensation, and the following exchange occurred:

> Counsel: And you were paid for the work you did for his construction business, were you not?
> Laurie: Ahm—
> Counsel: Yes or no? Were you paid?
> Laurie: I need to explain to it.
> Counsel: Yes or no? Were you paid?
> Laurie: I need to explain that part.
> The Court: Sir, you need to answer the question.
> Laurie: Okay. Yes.

The court followed up asking, "You were paid for work that you did for Mr. Victor at other properties?" Laurie answered, "Yes. Sometimes."

[3] The Revised Organic Act makes the Fifth Amendment's protection from forced confessions applicable to the Virgin Islands. *See Gov't of the V.I. v. Huggins*, 6 V.I. 3, 14 (V.I. Super. Ct. 1967) (noting that Virgin Islands tax laws must "conform[ ] ... to the 'due process' and 'equal protection' clauses of the Revised Organic Act and the 'due process' clause of the Fifth Amendment of the Constitution of the United States").

that time, neither he nor Victor went to the grocery store or otherwise brought groceries for the home. If Todman did not cook herself, she brought food from her place of employment, a restaurant. She also paid the telephone, gas, and electrical bills for the home. Todman used her vehicle to transport workers and building materials in addition to cleaning the worksite and generally "work[ing] tirelessly like a horse." During cross-examination, Laurie explained that, while both Todman and Victor transported building materials, with Victor utilizing his truck to transport larger materials and Todman using her sedan to transport the smaller materials, he was unsure which of the two, or whether both, had paid for the building materials that were used.

¶7    In addition to feeding those in her home, Todman provided food to the workers in the evenings and on Sundays. She would cook the food and bring it to the worksite. When Todman did not cook, Victor, Laurie, and all the others would receive food from Todman's place of employment. As Laurie explained, "Whoever working, how many people, right, you would call and me and him would go and pick up the food." Laurie testified that, during this construction at 278 Hospital Ground, he resided with Todman and Victor, "just next to his next house." Those men working for and living with Victor were him, "Buckman," "Tony," and "Skilleye," all from Guyana, and they all slept in the living room of Victor's home. Generally, the men would "work for [Victor] in the day, and if they don't go out [at night] they got to go and work at the property." With regard to Laurie's asserted lack of choice in working, he explained, "if we didn't work we had to leave the country." Victor's counsel ventured to ask, "Did you consider yourself a slave?" To which Laurie explained, "Well—the way how things—with him, the way how things went, as I say, we had no choice, you know, we had no choice." In 2008, Laurie quit working for Victor and moved out of Victor's property and lived in various apartments on St. Thomas. It was at this

time that Laurie's employment with Victor terminated, though when asked where he sought new employment, Laurie again invoked his right to remain silent.

¶8    During cross-examination, Laurie was asked by defense counsel, "Would you tell us, Mr. Laurie, when you decided to stop working for Mr. Victor and you moved out from the house, you did so without fear of being—of any punishment for that, didn't you?" When Laurie provided an explanatory answer, he was interrupted, "—right, really just calls for yes or no answer. You no longer felt fear of moving out?" Laurie stated simply, "No." However, defense counsel followed up, "Okay. So you discover that you really had a choice to stop working for Franklyn Victor; isn't that correct? Well, let me rephrase the question. You exercise the choice—you exercise the choice to stop working for Mr. Victor? You decide you would no longer work for him; right?" Laurie responded, "Yes."

¶9    Defense counsel then pressed further, asking "Okay. And there was no change between 2005 and 2008 that brought you to that realization, isn't that correct?" Laurie then explained, "Yes. There was a change." "I hadn't a choice—I had a choice in the sense that, if better can't be done with less worst continue—" "I meet a stage whereby, if better can't be done, worst gone continue. So I had to leave. Whatsoever happen will happen." "I was forced. Yes."

¶10   During re-direct examination, Laurie further explained the circumstances of his employment and his ultimate decision to stop assisting Victor. When Laurie agreed to come from Guyana to St. Thomas, it was agreed that, for each four weeks he worked, Victor would pay him for one week and keep three weeks' pay as "savings" for Laurie. Laurie, using the funds from his one week's pay, would save to provide money to his family in Guyana. It was expected that Victor would deliver the money to Laurie's family upon one of his many visits to Guyana, while Laurie was living on St. Thomas. At a time when Victor had "saved" approximately $10,000 for Laurie

and Laurie had given Victor his own funds with a request that Victor deliver them to Laurie's wife in Guyana, Victor simply never delivered the money to Laurie's wife (or anyone else) and never returned it to Laurie.

¶11    When he confronted Victor, Laurie was first thwarted when Victor told him to talk to him at a later date. Then, when Laurie followed up at the specified time, Victor simply refused to explain where Laurie's money was, telling him, "I say don't ask me for the money." Laurie was never paid the funds that Victor had agreed to hold on his (Laurie's) behalf.

¶12    Jacob Christian, Victor's cousin, was the next witness called on behalf of Todman. Christian and Victor had known each other since they had lived in Guyana, and Christian had helped Victor construct the cistern at the 278 Property, finishing work in 2003. Christian had helped Victor at the location because Victor was his cousin; so, Christian was not paid. The work performed by Christian "was voluntary." Christian knew other men (up to four at a time, with the men changing over time), such as a man named Gerald, working at the site, having known them back in Guyana. During Christian's time working with Victor, he never saw anyone receive payment. Christian also knew Todman and saw her "involvement in the work on the house" and knew of her relationship with Victor. Christian confirmed that she would bring lunch to the worksite. Similarly, Victor would ask Todman to transport building materials, including cement supplies, to the site, and she would. Likewise, she assisted with actual construction at the 278 Property. However, during his time, it was Christian and Victor who did most of the work.

¶13    Thevar Bristol, Todman's daughter, was Todman's next witness. When living with her mother, both she and her brother would read Todman's letters and other correspondence and documents out loud to Todman because Todman could not read. During cross-examination,

Thevar was asked whether she had ever observed Todman reading a newspaper, and she stated that she had not.

¶14     Todman then called Attallah Bertrand Rogers ("Bertrand"). Bertrand worked for Scotia Bank and oversaw a mortgage loan obtained by Victor. She served as the custodian of records for the times relevant to Victor's obtaining financing on the properties subject to this lawsuit. In 2004, Scotia Bank had approved a loan in the amount of $256,000 to construct a home on the 278 Property. Victor had provided a quitclaim deed executed in 2003 whereby, ostensibly, Todman had transferred her interest in the 278 Property to him. As of the day of Bertrand's testimony, had the mortgage on the 278 Property not been refinanced, and assuming payments had been made on time, the balance due was $226,641.57. Additionally, Victor obtained a line of credit in July of 2006, secured in part by the 278 Property.

¶15     Todman testified that she had known Victor for 24 years, having met him in Tortola while babysitting with Victor's sister. They began an intimate relationship, and Todman had a child with Victor, a son named Daryl Victor. She had two older children, Shane and Thevar Bristol, who would stay with Victor and the rest of the family in the summers when school was in recess. In 1997, Todman and Victor moved their family to St. Thomas, at which time Todman's two older children began living with them, and they remained together until 2008.

¶16     When Todman and Victor were living in the Bovoni neighborhood on St. Thomas, one night, Victor informed her of a piece of property located "around the field on top the hill." Victor further informed Todman that they were scheduled to view the property the next day. Following this, they proceeded to apply for a loan, and in order to obtain this financing for the purchase, Todman provided the down payment, as Victor did not have any cash reserves.

¶17    As to Victor's work history on St. Thomas, Todman explained that, initially, Victor did not get much work. He would get some odd jobs, but nothing too substantial. At the time they purchased the 278 Property, Victor was working three or four days a week. Todman attended the closing for 278, and Victor read the documents to her. Victor told Todman that it was his intention to build a two-story building wherein they could live in the lower level and lease the upper level, generating income. Victor found the workers to help with the construction, and Todman supplied the food, for which Victor never gave Todman any compensation, even if she bought it from her place of employment. As construction advanced, Todman assisted with obtaining and delivering building materials such as paint. At other times, Victor and Todman would work in conjunction without the other workers. Todman would hand cement, steel, and other materials to Victor for concrete work.

¶18    One afternoon, Victor came to Todman while they were living in Bovoni. Todman was busy mopping the bedroom floor, as she was cleaning the house on her day off, when Victor approached her and informed her that, in order to obtain a loan to refinance the 278 Property, Todman must sign a paper. Victor further explained to her that, since she had already signed on the previous loan, she did not have to attend the closing for this loan; all that was necessary was her signature on the paper. Todman was unable to read what was written on the paper. While only Victor and Todman were in the bedroom when Todman executed her signature, Jamaine Cotton was elsewhere in the apartment, and the children, then in junior high, were in the living room.

¶19    One day, a year or two after the time when Victor asked her to execute the paper in the bedroom, Victor informed Todman that there was a house for sale "round the field on top the hill, close to the other property" that they owned. Victor wanted the family to move to this new location. Victor then took Todman to the property, showing her around and inquiring about her

thoughts and opinions. Todman then, a week or two later, executed a document at Victor's request, as he had told her it was necessary for them to purchase the new property. Again, she did not read because she could not and trusted Victor to explain the meaning of the document.

¶20    The family moved from Bovoni to the Parcel no. 290 Property in 2005. 290 Hospital Ground consisted of one building with two three-bedroom apartments on the top two levels and a one-bedroom apartment on the lower level. Victor collected the rent from the topmost apartment and lower apartment; Todman trusted him in this family financial matter. While living at 290, as there was no rent to pay, Todman supplied the food, paid for cable TV and telephone service, and took care of the children. Victor paid the mortgage. At this time, Victor's nephews joined the family after the death of Victor's sister. Todman raised Victor's nephews as her own children, putting them through school, taking them to sports events, doing anything a parent would do. However, anytime the nephews asked Victor for money, he sent them to Todman.

¶21    When construction at the 278 Property was completed, the family moved to that property. 278 was a building with three levels, each with four bedrooms; the family lived in the middle level. Like with the 290 Property, Todman trusted Victor to collect the rental income on the other two apartments at 278 as well as the third apartment at 290, as it was being leased after the family had relocated. Again, the expenses were divided, with Victor paying the mortgage and Todman covering the remainder of the family expenses.

¶22    In 2008, Victor "kicked Todman out" of the 278 Property. Todman was served with a paper to appear in court, and at that hearing, she was informed that her name was no longer on the title to 278. With regard to the order from the domestic violence matter, Todman explained that Victor had kicked her out of the house, and only after that had the court ordered her to remain away from 278.

¶23    Todman was specifically asked, "If you had known that your name was no longer on the record or no longer on the property as an owner in November of 2003, would you have acted any differently from then until 2008?" Todman unequivocally stated that she would not have put her money, hard work, and heart into "all these things what I do for him. I would not have do that." As her reason for her actions she explained, "He make me believe that I have a part sharing what we—he tell me what we communicate we do together, and it wasn't so. It's the day when I go to court I understand all the paper what he give me to sign it was actually false. He told me sign this to get the loan and it was to take me off the house." As an example of other actions by Victor that induced Todman to believe they were acting as a partnership in their family life, Victor took Todman to a property in the Fredenhoj neighborhood because he wanted to purchase it. Victor again provided a document to Todman for her signature in order to obtain financing. Todman observed that other signatures were already present on this document.

¶24    With regard to the domestic violence matter, Todman explained that, one day, she woke up and was cooking breakfast for the family (including Victor), and she was served with an order to appear in court. In response to Victor's filing of a court action, Todman filed a domestic violence complaint against Victor. Further exploring this, Victor's counsel asked, "Isn't it a fact that you had Mr. Victor arrested?" Todman explained, "Yes, because the judge put me away from his bedroom in my own bedroom, and I was in there sleeping and he take a hammer and beat the door down to come after me, and I call the police, and them arrest him—arrested him."[4] Defendant's Exhibit 7 was then shown to Todman; she recognized her name on the document but nothing else.

---

[4] An offense report of the Virgin Islands Police Department corroborates that the handle to the bedroom door had been destroyed when Victor, despite a restraining order, attempted to enter Todman's room.

¶25    Victor was then called as an adverse witness.  He verified that his signature was on

Defendant's Exhibit 1 as a witness.  Rudolph McCurdy was also called as a witness, and he

testified that he had seen Todman execute the document identified as Defendant's Exhibit 1.

¶26    Victor then testified in his behalf.  Victor had worked for different contractors and aspired

to own his own property and build a home.  Upon discussing the purchase with Todman, she

questioned how it was affordable and how the mortgage would be paid.  Victor asserted that

Todman ultimately opposed the purchase of the property.  However, Victor also admitted he was

not able to purchase the property on his own.  As Victor explained, Todman had obtained her

citizenship status prior to him, and he could not obtain a loan while in his naturalization status at

the time.  Ultimately, after Victor explained the benefit to them in the long-term, he and Todman

purchased the 278 Property.

¶27    As to the 290 Property, Victor purchased the property by securing a bank loan based on his

income alone.  He collected $1,300 a month rent from the two units on that property in which his

family was not living.  Victor testified that he kept the purchase of 290 a secret from Todman, but

she moved with him and the family from Bovoni to the apartment at 290, at which time he informed

her of the purchase.  When asked about the decision to move from Bovoni to the 290 Property,

Victor was evasive.[5]

---

[5] The following interaction is demonstrative:

> **Counsel for Todman:** How did you get Miss Todman to agree to move to 290
> from Bovoni?
> **Victor:** We have a child together, and I don't think it would have been right for
> me to put my child—
> **Counsel for Todman:** Excuse me, sir, I don't think you're answering the
> question. I just ask you, how was it that you got her to move, not what you thought
> about—
> **Victor:** I don't know.

¶28    Todman explained that her children, Shane and Thevar, left the family home "because of Mr. Victor how—he was. When he come home in the evening and night my children had to stand up and say good night, they cannot sit down to say good night. He have a behavior with them, so they feel uncomfortable, my son tell me he going to look for a job and go night—and he go school, Adult Education. He get a job . . . ." But by Victor's testimony, Todman found a home for them and asked them to move out after the doctor confirmed Thevar's pregnancy. Victor confirmed he never contributed any financial assistance to Thevar and Shane when they moved out.

¶29    As to how household expenses were split for the family, Victor asserted that, when they were living in Bovoni, he and Todman contributed equally, "She would pay 50 percent and I would pay 50 percent." Victor elaborated, Todman "had a home phone that I told her we don't need. She see a need for a home phone so she was paying for the home phone. I had a cellphone so I didn't

---

**Counsel for Todman:** You don't know? Did you ask her? Did you bring it up to her?
**Victor:** Yes.
**Counsel for Todman:** What did you say?
**Victor:** She move—she said yes.
**Counsel for Todman:** No. What did she say yes to?
**Victor:** moving from 256 Estate Bovoni to 290 Hospital Ground.
**Counsel for Todman:** Did you tell her why you thought it was a good idea to move?
**Victor:** No.

. . . .

**Counsel for Todman:** . . . How did you suggest—how did you get her to agree to move without telling her anything about the rent or anything like that and she didn't know that it belong to you?
**Victor:** I did not get her to agree to move, I told her that we are moving from 256 to 290. She could have come she could have stayed. But we had a child together and I think it was the best for my child to go wherever I go, so she came.

In an effort to expose Victor's self-contradiction, Todman's counsel inquired, "Now, when she left in 2008, Daryl your child went with her; isn't that true?" and further inquired, "You didn't ask that Daryl stay with you, didn't you?" to which Victor answered he had not made any such request, when he explained the court had placed custody with Todman. It is noted that, as a matter of public record, in case ST-08-CV-313, submitted as an exhibit, is evidence that, in 2008, Victor denied paternity, and Todman had to obtain a paternity test to obtain a child support order to force Victor to support his son.

need a home phone." Victor was further asked, "other than the half of the expenses of the house, do you know what else expenses she had." His response was simply, "No." However, Victor later admitted that he did not pay the cable bill for the home, confirming that the "things that she wanted, which were, for instance, cable and telephone she paid for." Victor also confirmed he never cooked for the family.

¶30     Victor further testified that sometimes he would join Todman while shopping and pay for the groceries. He stated that there was no "standard amount" he contributed. It depended on what Todman could have done, since she worked largely on tips. Likewise, while he equivocated, he conceded Todman also "probably" paid the utilities at the 278 Property. When Todman did not earn much income from her work, Victor would then give her money for the family expenses. When asked specifically which children he helped, Victor said his son Daryl and his two nephews, Jamaine and Jharel. Todman was the primary contact for the schools, if anything should happen to any of the children.

¶31     Providing more details of the construction process, Victor confirmed that he and one other person from Guyana built the cistern. He also had another cousin from Guyana assist at a later date. Victor readily admitted that Todman cooked for the workers and "from time to time" transported materials to the construction site, all after transferring her ownership interest in the 278 Property. Then, one night, Victor came home around 11:00 p.m.—by his retelling—to be met by Todman accusing him of being with another woman. Victor "just walk [sic] past her" and he "say, well, if you want to hit me just hit me that's all right." He then proceeded to the bedroom and was followed by Todman. As Victor explained to Todman at that time, he "believe[d] it was best [Todman] take it. It's best you take the property as it is right now. The cistern is now poured as yet, I think you can manage $238. I gonna move on." In contrast to this statement, Victor

admitted he earned significantly more financially through his employment than Todman did through hers. Upon hearing this, Todman began "pulling her hair out her head" saying "No. Don't do that." Victor tells his response plainly, "I said I gonna leave, you know. So I say, well, if you don't want me to leave just take your name off of it." Todman was exclaiming that she had no idea what to do; "so [Victor] say, well, Winston Taylor is our attorney. You can go to Winston Taylor and he'll explain to you what you have to do . . . ."

¶32    Upon cross-examination, this subject matter was explored further, and Victor expanded upon the facts explicating that, when Todman expressed distress at the possibility of exclusively bearing the costs of a family and a mortgage on a property containing nothing more than a cistern, "I said, if you are not going to take it take your name off."

¶33    Addressing the 2008 domestic violence matter, Victor explained that he had been working at "KFC." Prior to this incident, Victor "used to receive texts on my phone that . . . I have a sexual transmitted disease" and "one night, me and Monica was at . . . Miracle on Main Street." As he was going to use the restroom, he received a text again; the texts "was coming from AT&T." Accordingly, Victor went to AT&T and accessed the self-pay kiosk. He entered the last four digits of Todman's social security number and discovered that it was registered under Thevar's name. Thus, Victor concluded that the texts were coming from Todman. He then told Todman that they both needed to go to the doctor, "and then it really fell apart." As to Victor's arrest in 2008, he gave his recounting. On a Friday night, the doctor had called Victor to explain that he was "clean"; so he put the phone on speaker for Todman to hear. But, when it came time to share Todman's results, she terminated the call, and Victor never heard her results. The next day, Victor went to the doctor, "and I ask him, how is it you are saying that I clean, and he tap me on my shoulder and he said, you are blessed."

¶34     After this, Victor asked Todman to move out. When Todman refused, Victor took all of

her clothes out of the closets and dressers and threw them in a pile on the floor. Victor asserted

that, in response, Todman called the police and told them Victor had hit her. The criminal domestic

violence matter was dismissed, according to Victor, though no court documents were submitted.

Regarding the domestic violence matter, ST-08-DV-118, Victor explained that an attorney advised

him to file a reciprocal complaint of domestic violence against Todman.

¶35     During the pendency of the domestic violence matter, Victor was "locked up" twice.

Ultimately, the family court entered an order that included a mandate that Victor pay child support

and rent for Todman's residence, as he had coerced her to leave, along with his son. Regarding

the child support obligation, Victor once went to Guyana and could not return or renew his visa

because he owed approximately $17,000 in child support.

¶36     Although Victor explained that the judge had ordered Todman to leave the home and he

pay her rent, Todman's counsel explored this on cross-examination. Victor was asked, "when the

judge said that Miss Todman would have to leave the house, that was because you said you wanted

her out and you showed that the title was only in your name; isn't that correct." Victor denied this,

though he admitted he was obligated to pay her rent. Victor was further asked, "And then Miss

Todman had to go back to the Court because you hadn't paid, I think it was the half of the deposit

and Miss Todman was having to borrow money and things of that sort; isn't that correct." Victor

retorted, "No. You looking for a bounce check?" So Todman's counsel questioned further, "You

were brought back to court on an order to show cause asking that you pay one-half of the deposit

on Miss Todman's new residence; correct?" Victor answered, "I can't remember that." Victor

did concede that Todman first learned that title to the 278 Property was solely in Victor's name at

the domestic violence hearing.

## B. The Superior Court's Findings of Fact and Judgment

¶37    In support of its final judgment, the court entered certain findings of fact and conclusions of law. It found that Todman and Victor had met in the British Virgin Islands in the early 1990's. Their relationship became romantic, and though they were never married, they had a son together in 1995. In 1995, Victor came to St. Thomas and arranged for Todman to follow in 1997, at which time the family lived together until 2008 when the relationship between Todman and Victor ended. During the course of that relationship, Victor was regularly employed as a builder and/or contractor while Todman worked as a cook and dishwasher. Todman attended school in St. Vincent and the Grenadines until the age of 13 and had no further education. As a consequence, Todman could not read, and her writing was limited to signing her name in English. Todman's older children had assisted her in reading important documents but they had left the family home before 2005. In contrast, it was found that Victor was literate in English and fully aware that Todman was not. The court specifically found that Victor and Todman had a "confidential" relationship. The court further made the following findings.

¶38    Upon moving to St. Thomas, the parties had lived together in an apartment in Bovoni until 2005. During this time, the rent was divided evenly, and Todman supplied food to the household and paid the household utilities. It was during this time that Victor found the 278 Property was for sale and showed it to Todman. They then agreed to purchase the property, but Victor could not obtain financing without Todman cosigning the loan. Todman and Victor took title to 278 jointly. While Todman was present at the closing on 278, she trusted Victor to handle the real estate transaction. Following the purchase, Todman provided the funds to excavate 278 as the necessary first step to constructing the two-story building they intended.

¶39     While at the family home, in 2003, Victor asked Todman to execute what he had represented to be some papers necessary to obtain a construction loan to begin work at the 278 Property. Todman trusted and relied on Victor when she executed the papers at that time. However, the paper Todman signed was a quitclaim deed that conveyed her entire interest in 278 to Victor. Todman never intended to transfer her interest in the real property to Victor or to anyone. Victor was one of the two subscribing witnesses to Todman's signature of the deed, which was recorded on July 19, 2004. Although the deed recites that Todman received consideration, she never received the specified compensation and never declined any such offer of compensation.

¶40     Utilizing the 278 Property as security, Victor obtained a construction loan in the amount of $256,000 in August of 2004. Victor, a contractor by trade, oversaw the construction and arranged for boarders to live with him and Todman while assisting with the construction at 278. In 2005, the construction loan was converted to a mortgage on 278. During the construction, Todman, unaware that she had signed away her ownership interest in 278, provided meals for Victor and the boarders, worked on and assisted with the construction, and purchased and delivered building materials.

¶41     During the construction at 278, Victor purchased the 290 Property, and the family moved there to live. Todman did not contribute money to the purchase of 290 and was unaware that 290 had been purchased by Victor and was not so informed until after they had begun living there. This parcel had a mortgage attached to it in the amount of $274,050.

¶42     On July 26, 2006, Victor refinanced his loans and consolidated them into one loan secured by a mortgage on the 278 Property. $40,181.48 was disbursed to Victor after prior loans and other expenses were paid. Then, on July 31, 2006, Victor obtained a $50,000 line of credit, secured by a mortgage on 290. The loan and line of credit were obtained because Victor included rental

*Victor v. Todman*               2024 VI 18
S. Ct. Civ. No. 2018-0045
Opinion of the Court
Page 19 of 57

income from the properties, including the 278 Property, in his overall income, as his personal income alone would not have qualified him for a loan. Todman signed no papers relating to the financing or purchase of 290.

¶43    Following the purchase of 290, the family moved into one of the apartments on that property, where Todman paid the telephone bill and electric bill and provided food for the entire household. Following completion of construction, the family moved to the 278 Property, where, again, Todman paid utilities and purchased food and other essentials for the family home. As previously noted, Victor used monies earned from rent to pay the mortgage on all of the properties. During this time, Victor's two nephews lived with the family, and Todman "provided their care."

¶44    In 2008, there was an incident of domestic violence. It was during the course of this matter that Todman learned 1) that she had signed a deed conveying her interest in the 278 Property to Victor and 2) that her name was not on the deed to 278. Todman never intended to sign any instrument conveying her interest in 278. The pay off balance of the mortgage, as of the trial in May of 2016, was $226,641.57.

¶45    The trial court then made the following conclusions of law. First and foremost, a confidential relationship existed between Todman and Victor. Victor misled Todman into executing the quitclaim deed by making her believe that her signature was needed for a construction loan. Victor committed fraud when he represented the document to be part of the application for a bank loan, when it was in actuality a deed conveying her interest in the 278 Property to Victor. That deed, though recorded, was void ab initio.

¶46    The court then made further conclusions of law. For example, it concluded that Todman could not be awarded damages for her claim of unjust enrichment because the property had been obtained by Victor under fraudulent circumstances, relying on *Martin v. Martin*, 54 V.I. 379, 396

(V.I. 2010). Also, the court specifically concluded that the validity of a deed wherein the grantor's signature is witnessed by the grantee need not be considered, as the deed was deemed void ab initio on other grounds. Further, the court concluded that Todman did not assert a claim for undue influence, and the court did not find undue influence. Ultimately, the court concluded that Victor holds the 278 Property in constructive trust for Todman, and Todman is entitled to an undivided one-half interest in 278.

¶47     The Superior Court entered a judgment on February 21, 2018, though the certification of the order indicates a date of July 6, 2018. In this judgment, it was ordered that Todman held an undivided one-half interest in 278 Hospital Ground and that Victor held the 278 Property in constructive trust for the benefit of Todman. It was further order that Todman's interest was subject to her "share of the liability on the mortgage" in the amount of $226,641.57.

## II.     DISCUSSION

### A. Jurisdiction

¶48     The Superior Court entered the judgment from which Victor appeals on February 21, 2018. Victor filed his notice of appeal on June 15, 2018, and Todman filed her cross-notice of appeal on July 31, 2018. "This Court, being an appellate court, is a court of limited jurisdiction, and must be satisfied of its own appellate subject matter jurisdiction before it considers the merits of an appeal." *World Fresh Markets, LLC v. Henry*, 2019 VI 30, ¶14 (citing *People v. Rios*, S. Ct. Crim. No. 2007-0112, 2008 WL 5605714, at *1 (V.I. Nov. 14, 2008) (unpublished); *V.I. Gov't Hosp. & Health Facilities Corp. v. Gov't of the V.I.*, 50 V.I. 276, 279 (V.I. 2008)). We must first, then, determine whether the order from which Victor appeals is a final judgment and whether the notice and cross-notice of appeal were timely, or such objection to timeliness has been waived. V.I. R. APP. P. 22(m); *Peters v. Gov't of the V.I.*, 60 V.I. 479, 481 n.1 (V.I. 2014).

¶49    The Revised Organic Act of 1954, as amended ("ROA"), is the *de facto* constitution of the Territory, and the grant of jurisdiction to the courts of the Virgin Islands contained in the ROA controls over statutes passed by the Virgin Islands Legislature. *Hodge v. Bluebeard's Castle, Inc.*, 62 V.I. 672, 682 (V.I. 2015); *Gov't of the V.I. v. Crooke*, 54 V.I. 237, 247 (V.I. 2010). "Pursuant to the Revised Organic Act of 1954, [as amended,] this Court has appellate [subject matter] jurisdiction over 'all appeals from the decisions of the courts of the Virgin Islands established by local law.'" *In re Petition for Expungement*, 66 V.I. 299, 302 (V.I. 2017) (quoting 48 U.S.C. § 1613a(d)). "Within the ROA framework, 'the Virgin Islands Legislature unquestionably possesses the authority to determine the jurisdiction of Virgin Islands courts. The Legislature has exercised that authority by adopting the [final judgment rule] and [establishing] a set of permissible interlocutory appeals as of right.'"[6] Therefore, this Court has jurisdiction over all appeals arising from a Final Judgment of the Superior Court. 48 U.S.C. § 1613a(d); V.I. CODE ANN. tit. 4, § 32(a); *Toussaint v. Stewart*, 67 V.I. 931, 939 (V.I. 2017).

¶50    The final judgment rule is embodied in title 4, subsections 32(a) and 33(a) of the Virgin Islands Code, which state that "'[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided

---

[6] *World Fresh Markets*, 2019 VI 30, ¶15 (quoting *Stiles v. Yob*, S. Ct. Civ. No. 2016-0027, 2016 WL 3211244, at *3 (V.I. June 8, 2016) (per curiam) (unpublished), and citing 4 V.I.C. §§ 32(a), 33(a); *Enrietto v. Rogers, Townsend & Thomas P.C.*, 49 V.I. 311, 315 V.I. 2007)); 4 V.I.C. § 32(a) ("all appeals arising from final judgments, final decrees, [and] final orders of the Superior Court"); 4 V.I.C. § 33(a) ("Appealable judgments and orders . . . shall be available only upon entry of final judgment in the Superior Court."). The jurisdiction of this Court, as set forth in subsections 32(a) and 33(a) of title 4 of the Virgin Islands Code, is a codification of the finality requirement that has been a part of U.S. common (and statutory) law since this country's founding and requires those wishing to challenge a ruling of a lower court to "'raise all claims of error in a single appeal following final judgment on the merits.'" *Enrietto*, 49 V.I. at 315 (quoting *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 429-30 (1985)); *see also Joseph v. Daily News Publishing Co., Inc.*, 57 V.I. 566, 578 V.I. 2012) ("Section 32 embodies the final judgment rule, which generally requires a party 'to raise all claims of error in a single appeal following final judgment on the merits.'" (quoting *Bryant v. People*, 53 V.I. 395, 400 (V.I. 2010)); *see generally Bachowski v. Usery*, 545 F.2d 363, 368 n.20 (3d Cir. 1976) (citing *Metcalfe's Case*, 77 Eng. Rep. 1193 (K.B. 1615); C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE & PROCEDURE – CIVIL § 3906, pg. 425-26 (1976)).

by law'" and limits the availability of an appeal to "only upon entry of final judgment in the Superior Court from which appeal or application for review is taken." 4 V.I.C. §§ 32(a), 32(b). "'A [final judgment] is a judgment from a court which ends the litigation on the merits, leaving nothing else for the court to do except execute the judgment.'" *Toussaint*, 67 V.I. at 939 (quoting *Ramirez v. People*, 56 V.I. 409, 416 (V.I. 2012) (citations omitted)). The entry of a final judgment implicitly denies all pending motions, and all prior interlocutory orders merge with the final judgment. *Toussaint*, 67 V.I. at 940 n.3 (citing *Simpson v. Bd. of Dirs. of Sapphire Bay Condos. W.*, 61 V.I. 728, 731 (V.I. 2015); *In re Estate of George*, 59 V.I. 913, 919 (V.I. 2013)).

¶51    Here, the record as to the timing of the entry of the judgment and the filing of the notice of appeal is confusing. The findings of fact and conclusions of law bear: (1) the judge's signature with a date of February 21, 2018, (2) the signed attestation of the clerk of the court dated February 21, 2018; (3) and the raised seal (photostatically copied) of the clerk of the court certifying its authenticity dated February 21, 2018. While the final judgment also bears both the judge's signature and the attestation of the clerk of the court dated February 21, 2018, the raised seal (photostatically copied) bears the date "July 6, 2018." Victor's notice of appeal was filed June 15, 2018, but states that he received the final judgment on May 16, 2018.

¶52    However, Todman filed a motion for correction of judgment on March 15, 2018, seeking relief pursuant to Rule 60(a) of the Virgin Islands Rules of Civil Procedure, thus having the legal effect of tolling the time for filing a notice of appeal until 30 days after the determination of such motion or after such motion has been pending without determination for 120 days. V.I. R. App. P. 5(a)(4). On July 9, 2018, Todman filed in this Court a motion to dismiss, which was denied on July 13, 2018. In denying the motion to dismiss, this Court noted that, pursuant to Rule 5(a)(4) of the Virgin Islands Rules of Appellate Procedure, the deadline for Victor to seek appeal was tolled

during the 120-days' pendency of Todman's Rule 60(a) motion for correction of judgment. V.I.R. APP. P. 4(a), 5(a)(1). The Superior Court did not deny the motion for correction of judgment until October 24, 2018, and the 120-day deadline would have expired on July 13, 2018. Todman filed her notice of appeal, thus cross-appealing, on July 31, 2018.

¶53     Victor's notice of appeal was held in abeyance and remained inoperative until July 13, 2018, the expiration of the 120-day period for the Superior Court to take action. V.I.R. APP. P. 5(a)(4). Therefore, the 14-day deadline for Todman to file her notice of cross-appeal commenced July 14, 2018, and Todman's deadline for filing her notice expired on July 28, 2018, a Saturday. V.I.R. APP. P. 5(a)(1) ("A notice of appeal filed after the announcement of a judgment or order—but before entry of the judgment or order—is treated as filed on the date of and after entry of judgment."); V.I. R. APP. P. 5(a)(3). Even extending the time for filing her notice of appeal to the next business day, Todman's deadline for filing her appeal was July 30, 2018. *See* V.I. R. APP. P. 16(b).

¶54     While Victor's notice of appeal became operative on July 14, 2018, Todman's notice of cross-appeal was untimely. However, as this Court has repeatedly noted, the deadline set forth for filing a notice of appeal is a claims-processing rule subject to wavier. *Peters*, 60 V.I. at 481 n.1. As Victor has not pressed this claims-processing rule and has failed to do so up and through his filing of his reply brief, in which he then responds to the merits of Todman's cross-appeal, he has waived any such objection to the timeliness of Todman's notice of cross-appeal. *See, e.g., World Fresh Markets*, 2019 VI 30, ¶19 (noting that appellee had waived any claim of mootness for failing to raise it at the first incident of substantive filing in this Court (citing *Hodge*, 62 V.I. at 687 n.8)); *People v. Rivera*, 68 V.I. 393, 414 (V.I. Super. Ct. 2018) (by responding to the merits of a motion that may properly be deemed untimely, the responding litigant forfeits any claim of untimeliness)

(citing *Webster v. FirstBank P.R.*, 66 V.I. 514, 518 n.2 (V.I. 2017) and *Simpson v. Golden*, 56 V.I. 272, 281 n.6 (V.I. 2012)).[7] Therefore, this Court has appellate subject matter jurisdiction over both Victor's appeal and Todman's cross-appeal.

## B. Standard of Review

¶55 Victor presents three issues for determination. First, Victor asks this Court to consider "whether, the trial court erred in rescinding a deed based on Appellee's uncorroborated testimony alone, without evaluating whether Appellee had satisfied her burden of rebutting, by clear and convincing evidence, the presumption of validity given a certified acknowledgment made pursuant to 28 V.I.C. § 86?" This issue presents certain sub-issues for consideration. First, what is the evidentiary effect of an acknowledgement of an instrument transferring an interest in real property—that is, does a properly acknowledged deed give rise to an evidentiary presumption of its validity? Second, if the deed is presumptively valid (requiring clear and convincing evidence to overcome such presumption), did Todman's evidence overcome such presumption and support the conclusion that the deed was invalid as procured by fraud in the inducement? These sub-issues are questions of law over which this Court exercises plenary review, considering each de novo. *Bradford v. Cramer*, 54 V.I. 669, 672 (V.I. 2012).

¶56 Taking the issues presented out of order, Victor, in his third issue presented on appeal, attacks the trial court's conclusion that Todman reasonably relied upon Victor in finding that

---

[7] *Cf. Prosser v. Public Serv's Comm'n*, 56 V.I. 391, 403 n.9 (V.I. 2012) ("Where a party timely raises a claims processing rule that was violated by its opponent, we have no choice but to dismiss based on it." (citing *Gov't of the V.I. v. Martinez*, 620 F.3d 321, 328-29 (3d Cir. 2010))); *see generally Penn v. Mosley*, 67 V.I. 879, 891 n.4 (V.I. 2017) (discussing the distinctions between a judgment, order, and decree); *Miller v. Sorenson*, 67 V.I. 861, 871 (V.I. 2017) (discussing the distinctions between a judgment and decree); *Cianci v. Chaput*, 68 V.I. 682, 688 (V.I. 2016) (quoting *In re Estate of George*, 59 V.I. at 919); *Prosser v. Prosser*, 33 V.I. 32, 40 (V.I. Super. Ct. 1995) (Noting that "with the procedural merger of law and equity in the federal and most state [and territorial] courts under the Rules of Civil Procedure, the term 'judgment' has generally replaced 'decree'." (quoting BLACK'S L. DICT. 410 (6th ed. 1990); citing 16 V.I.C. §§ 108, 110, 111; 46 AM. JUR. 2D *Judgments* § 2 (1969)).

Todman was fraudulently induced into executing the quitclaim deed (e.g., "The key inquiry here

is whether Todman's reliance on Victor's alleged misrepresentation was reasonable under the

circumstances."), arguing in his appellate briefing that

> it was unreasonable for Todman to rely on Victor's alleged
> misrepresentation, given the stormy nature of their relationship, the
> importance of the information presented to her, and the fact that her
> two teenage children, who she relied on routinely to have documents
> read to her, were only a few feet way.

Victor ultimately argues that the trial court abused its discretion in determining that Todman's

actions were reasonable.

¶57      As the actual determination of whether a person's conduct was reasonable under the

circumstances presented (as opposed to making that same determination as a matter of law) is a

question of application of law to fact, it is subject to review for abuse of discretion. *See Miller v.

Sorenson*, 57 V.I. 861, 868 (V.I. 2017) ("The Superior Court's application of law to fact is

reviewed for abuse of discretion." (citing *Billu v. People*, 57 V.I. 455, 461-62 (V.I. 2012))). The

underlying factual predicates composing the facts to which the trial court applied the law are

subject to clear error review like any other factual determination of the trial court—more

succinctly, the judgment will be reversed if findings of fact material to the issues presented are

clearly erroneous. *Cornelius v. Bank of Nova Scotia*, 67 V.I. 806, 816 (V.I. 2017) (citing

*Rodriguez*, 58 V.I. at 371; *Rivera-Moreno v. Gov't of the V.I.*, 61 V.I. 379, 302-03 (V.I. 2014);

*Blyden*, 53 V.I. at 646)). Yet, Victor is correct that the determination of whether, as a matter of

law, the facts taken in the light most favorable to the judgment of the finder of fact do (or do not)

make Todman's conduct unreasonable is a legal question to which we owe no deference to the

trial court and is subject to plenary, *de novo*, review. *Bradford*, 54 V.I. at 672.[8]

¶58     Victor further argues that the award to Todman of a one-half undivided interest in the 278

Property was an abuse of discretion because the trial court did not consider the relative value of

Todman's contributions to the 278 Property *vis a vis* Victor's.  On this point, Todman cross-

appeals, arguing that the trial court erred in determining that Todman's one-half undivided interest

in the 278 Property is burdened by the entire balance of the mortgage secured by the 278 Property.

To the extent the trial court's final judgment is based on findings of fact, it will only be overturned

if clearly erroneous, i.e., there is clear error. *Cornelius*, 67 V.I. at 816 (citing *Rodriguez*, 58 V.I.

at 371; *Rivera-Moreno*, 61 V.I. at 302-03; *Blyden*, 53 V.I. at 646).  However, to the extent the facts

as found by the Superior Court are not clearly erroneous, its equitable division of the property will

be reviewed only for abuse of discretion. *Browne v. Stanley*, 66 V.I. 328, 331 (V.I. 2017) (citing

*V.I. Waste Mgmt. Auth. v. Bovoni Invs.*, LLC, 61 V.I. 355, 363 (V.I. 2014); *St. Thomas-St. Bd. of*

*Elections v. Daniel*, 49 V.I. 322, 329-30 (V.I. 2007)).  An abuse of discretion occurs when a trial

court's ruling "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an

improper application of law to fact." *Smith v. Henley*, 67 V.I. 965, 978 (V.I. 2017) (quoting

*Stevens v. People*, 55 V.I. 550, 556 (V.I. 2011)).

---

[8] *See also Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 225 (1st Cir. 2003) (noting that, upon review, the court will "draw 'all reasonable inferences in favor of the prevailing party,' and will affirm 'unless the evidence was so strongly and overwhelmingly inconsistent with the verdicts that no reasonable jury could have returned them.'" (quoting *Walton v. Nalco Chem. Co.*, 272 F.3d 12, 23 (1st Cir. 2001))).

**C. Evidentiary Sufficiency to Prove by Clear and Convincing Evidence that Victor Fraudulently Induced Todman to Execute the Grant of Land, Rendering the Quitclaim Deed Void Ab Initio**

¶59     The first questions to be answered are whether the recording of a duly acknowledged deed creates an evidentiary presumption as to the deed's validity and whether the evidence presented in this case overcame that presumption by the required standard of clear and convincing evidence.[9] To this end, the statutory text provides guidance.

**1. A Duly Acknowledged and Recorded Deed Gives Rise to a Presumption of Validity that the Challenging Party Must Overcome by Clear and Convincing Evidence.**

¶60     Government officials, including the courts, must accept the certification of the acknowledgement of a deed if, *inter alia*, either the certification is in a form prescribed under Virgin Islands law or the certification contains words importing a meaning equivalent to stating "acknowledged before me." 28 V.I.C. § 85(a), (c).[10] The fact that the Legislature chose to deny to those conducting their affairs within the territorial limits[11] of the Virgin Islands the discretion

---

[9] The issue of the presumption of the validity of the deed was originally waived, as it was never raised before the trial court. However, Todman waived this waiver by arguing against such a presumption in her appellate brief, thereby placing the issue properly before this Court.

[10] The Virgin Islands Legislature has, in section 85 of Title 28, provided the following obligation regarding acknowledgments:

> The . . . acknowledgement used . . . shall be accepted in the Virgin Islands if one of the following is true:
> (a)     The certificate is in a form prescribed by the laws or regulations of the Virgin Islands;
> . . . . or
> (c)     The certificate contains the words 'acknowledged before me', or their substantial equivalent.

28 V.I.C. § 85(a), (c).

[11] "Virgin Islands," when used in the Code, indicates, "in a geographical sense, . . . the same territorial domain . . . designated . . . in section 2(a) of the [ROA]." 1 V.I.C. § 41; *see also* 48 U.S.C. § 1405; 1 V.I.C. § 2 (providing that the Code is applicable throughout the Virgin Islands). Territorial jurisdiction is the "territory over which a government, one of its courts, or one of its subdivisions has jurisdiction." BLACK'S L. DICT. at 871; *see also Id.* at 869 (defining "legislative jurisdiction" as "a legislature's general sphere of authority to enact laws and conduct all business related to that authority, such as holding hearings"); *id.* (defining "judicial jurisdiction" as "the legal power

and choice of whether to accept or reject any acknowledgement under the foregoing conditions is an indication that such acknowledged instruments are presumptively valid. If the Legislature wished in every instance to leave the determination of the validity of a grant of land to be litigated in court with both parties free to marshal whatever evidence they respectively find appropriate, such a provision would be entirely unnecessary.

¶61  Indeed, if the Legislature intended an evidentiary contentious dispute when a person wished to challenge the validity of a deed, section 85 of title 28 achieves the exact opposite result. Section 85 demands that, when the dictates of the law governing execution and acknowledgement of instruments of transfer have been complied with, all those subject to the laws of the Virgin Islands must accept the acknowledgment as valid. Buttressing this position, the Legislature did not limit the application of section 85 to officials of the executive branch, or even government officials generally, and instead, chose to make acceptance mandatory upon all persons.

¶62  This conclusion that a duly acknowledged deed is presumptively valid is bolstered by the provisions of section 86 of title 28 defining what it means when it is declared that an instrument of transfer was "acknowledged before me."[12] This acknowledgement, in the context of the

---

and authority of a court to make a decision that binds the parties to any matter properly brought before it."); *see generally Rose v. Himley*, 8 U.S. (4 Cranch) 241, 279 (1808) ("It is conceded that the legislation of every country is territorial; that beyond its own territory, it can only affect its own subjects or citizens. It is not easy to conceive a power to execute a municipal law, or to enforce obedience to that law without the circle in which that law operates. A power to seize for the infraction of a law is derived from the sovereign, and must be exercised, it would seem, within those limits which circumscribe the sovereign power. The rights of war may be exercised on the high seas, because war is carried on upon the high seas; but the pacific rights of sovereignty must be exercised within the territory of the sovereign."); *United States v. Bevans*, 16 U.S. (3 Wheat.) 336, 386-87 (1818) ("What then is the extent of [the judicial] jurisdiction which a state possesses? We answer, without hesitation, the [judicial] jurisdiction of a state is coextensive with its territory, coextensive with its legislative power."); *see, e.g.*, 4 V.I.C. § 82(a) ("The process of the Superior Court runs throughout the territory."); *Norman's*, 10 V.I. 495, 503 n.7 (D.V.I. 1974) ("By providing that the process of the [court] 'shall run throughout the Virgin Islands," [the Legislature] was merely stating that, although there were three major islands and many smaller islands, islets, and cays, service could be made on any one of the islands, islets, and cays within two defined jurisdictional divisions . . . .").

[12] While Todman attempts to distinguish *Butler v. Encyclopedia Brittanica, Inc.*, 41 F.3d 285, 293-294 (7th Cir. 1994), this distinction fails. The portion quoted by Todman begins from the premise that a notary does not attest to the

execution of a quitclaim deed, is an affirmative statement that the grantor acknowledges executing the deed for the purposes stated therein, i.e., for the purpose of transferring the grantor's interest in the real property to the grantee. Likewise, subsection 777(c) of title 3 mandates that a notary, when acknowledging a deed pursuant to subsection (a) of section 777, must "inquire of each person executing a document as to the truth and authenticity of such document." 3 V.I.C. § 777(c). This mandatory duty placed upon notaries public is a further indication that a duly acknowledged deed is presumptively valid, for such an inquiry is entirely unnecessary if the deed's validity is questionable upon entering the court.

¶63 Additionally, Virgin Islands law demands clear and convincing evidence to justify a court's determination that a duly acknowledged and recorded deed was fraudulently obtained, further indicating that an instrument containing an acknowledgment valid on its face is presumptively valid until overcome by opposing evidence. *Wilkinson v. Wilkinson*, 70 V.I. 901, 915-19 (V.I. 2019). As such, a duly acknowledged and recorded deed is presumptively valid requiring clear and convincing evidence to establish the deed's invalidity. As this acknowledgment is valid, as determined in the above analysis, all those in the Virgin Islands were under an obligation to accept what is legally meant by such an acknowledgement. Of course, determining such presumptive validity of a duly acknowledged quitclaim deed does not answer the question of whether the evidence overcame such a presumption.

¶64 Therefore, we are presented with two questions: (1) whether the trial court's conclusion that the deed was procured by fraud in the inducement was correct as a matter of law (or,

---

validity of the statements made in the instrument. However, subsection 86(3)(i) of title 28 dictates that such a certification in the Virgin Islands is a certification that the person signing the instrument did so "for the purposes stated therein." Obviously, we must apply Virgin Islands statutory law when it is in direct conflict of case law from other jurisdictions.

conversely, was Todman's failure to obtain the assistance of a third party in order to understand the deed she had signed, under the circumstances of this case, unreasonable, thus making any finding of fraud in the inducement unwarranted as a matter of law) and (2) whether the proof offered in the present record overcame such a presumption by clear and convincing evidence. Certainly, if the question were simply whether the evidence preponderating in favor of the determination of the conclusions of the finder of fact was sufficient to support a conclusion of fraud in the inducement, there would be no dispute.

¶65     The evidence in the record provided an eminently reasonable factual basis supporting the Superior Court's conclusion that Todman was fraudulently induced to sign the quitclaim deed when Victor, knowing her inability to read, presented her with a document represented to be a loan application at a time and under such circumstances that, in light of their long and turbulent relationship, would exert undue pressure on Todman to execute the document without questioning Victor's motives. However, simply because evidence rises to the level of a preponderance in favor of one party does not answer the question of whether that same evidence was so strong that it rose to such a level that it was clear and convincing proof.

¶66     In order to satisfy the clear and convincing evidence standard of proof, a party must present "'evidence indicating that the thing to be proved is highly probable or reasonably certain'," i.e., "'evidence showing a high probability of truth of the factual matter at issue'." *Browne*, 50 V.I. at 265 (quoting *In re Laxton*, 647 N.W.2d 784, 795 (Wis. 2002); BLACK'S LAW DICTIONARY 596 (8th ed. 2004); MERRIAM-WEBSTER'S DICT. OF LAW 172 (Collector ed. 2005)). A grant of an interest in land by deed is a contract, *Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 590 & n.11 (1819) (noting that a grant of land is a contract that is no longer executory, but is,

instead, executed).[13] Proof of fraud in the inducement to a contract requires "that: (1) there was a misrepresentation, (2) the misrepresentation was fraudulent or material, (3) the misrepresentation induced the recipient to enter the contract, and (4) that the recipient's reliance on the misrepresentation was reasonable." *Wilkinson*, 70 V.I. at 914.[14]

¶67     A misrepresentation is "'an assertion that is not in accord with the facts.'" *Id.* (quoting *Lempert v. Singer*, 26 V.I. 326, 338 (D.V.I. 1991)). A "misrepresentation is fraudulent where the maker 'intends his assertion to induce a party to manifest his assent and the maker (a) knows or believes that the assertion is not in accord with the facts, or (b) does not have the confidence that he states or implies in the truth of the assertion, or (c) knows that he does not have the basis that he states or implies for the assertion." *Id.* (citing *Pollara v. Chateau St. Croix, LLC*, 58 V.I. 455,

---

[13] *See also Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136 (1810) ("A contract is a compact between two or more parties, and is either executory or executed. An executory contract is one in which a party binds himself to do, or not to do, a particular thing . . . . A contract executed is one in which the object of the contract is performed; and this . . . differs in nothing from a grant. . . . A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right. A party is, therefore, always estopped by his own grant." (citing Blackstone)); BLACK'S L. DICT. at 719 (defining "grant" as "the formal transfer of real property"); *id.* ("An agreement that creates a right of any description other than the one held by the grantor. Examples include leases, easements, charges, patents, franchises, powers, and licenses"; "The document by which a transfer is effected; esp., Deed."; "The property or property right so transferred.").

[14] Despite this Court's express acknowledgement in *Penn*, 67 V.I. 879—a full six months and ten days prior to the issuance of the final judgment in this matter—that the elements of fraud in the inducement arising from a confidential relationship had never been adopted in conformance with the standards set forth in *Banks v. International Rental & Leasing Corp.*, 55 V.I. 967 (V.I. 2011), and *Gov't of the V.I. v. Connor*, 60 V.I. 597 (V.I. 2014) (a "Banks Analysis"), subsequent to the final judgment in this matter, this Court has adopted the common law elements of fraud in the inducement. *E.g.*, *Wilkinson*, 70 V.I. 901; *see Sunshine Shopping Center, Inc. v. LG Electronics Panama, S.A.*, Case No. 2015-0041, 2018 WL 4558982, at *8 (D.V.I. Sept.21, 2018) (unpublished) (noting that exploitation of a confidential relationship to fraudulently induce a party to that relationship to unknowingly execute a quitclaim deed transferring ownership sounds in fraudulent inducement (citing *Ross*, 58 V.I. at 313)). So, while the failure to conduct a Banks Analysis is error per se requiring no analysis from this Court to justify immediate reversal and remand to the Superior Court to do its job, *see, e.g.*, *Cornelius*, 67 V.I. at 825 (failure to conduct a Banks Analysis grounds for summary reversal); *Penn*, 67 V.I. at n.7; *Toussaint*, 67 V.I. at 952, such actions now would be a waste of judicial resources. *See, e.g.*, *Inniss v. Inniss*, 65 V.I. 270, 279 n.7 (V.I. 2016) (conducting a Banks Analysis in the first instance on appeal to avoid waste of judicial resources and further burdening parties in matters of domestic relations). The *Wilkinson* opinion was issued on March 26, 2019, and Appellant's brief was filed April 2, 2019. We acknowledge that this is a short time, but this Court's opinions are available electronically on its website, usually within 24 to 48 hours of the issuance of an opinion. While counsel does not appear to have acted in bad faith, we remind counsel to regularly check the court's website for new opinions and to conduct an update review of their research prior to filing. Diligence in verifying authorities saves time and resources.

471 (V.I. 2013)). A misrepresentation is material 'if it would be likely to induce a reasonable

person to manifest his assent, or if the maker knows that it would be likely to induce the recipient

to do so.'" *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 162(2)).

¶68     In regard to whether Todman's evidence of fraud in the inducement of the contract for a

grant of an interest in land was clear and convincing such that it overcame the presumptive validity

of a deed duly acknowledged and recorded in accordance with Virgin Islands law, there is no

doubt. It is difficult to presume how a party could bring further evidence to bear on fraudulent

inducement to a contract. While Todman's testimony provided a minimum evidentiary factual

record, in nearly all material respects Todman's testimony was corroborated by other evidence,

often in multiple instances and quite often by Victor's own testimony. *Cf. Greer v. People*, 2021

VI 7, ¶41 ("[E]vidence is not insufficient because testimony from witnesses may be contradictory

or evidence may be in conflict, which, in reality, means that the finder of fact must have made a

credibility determination and weighed the evidence presented." (citing *Marcelle v. People*, 55 V.I.

536, 547 (V.I. 2011); *Smith v. People*, 51 V.I. 396, 401 (V.I. 2009))).

¶69     Victor's testimony establishes that he and Todman met in 1993 and began an intimate

relationship, holding themselves out to the public as an unmarried family unit (and as "unmarried

spouses") ultimately having one child together. In 1997, the family moved to St. Thomas, where

Victor had been working in construction. He took Todman to the 278 Property, and after

explaining the financial benefits of buying the property and developing it, they decided to purchase

the property together. Indeed, Victor admits he could not have obtained the loan for the purchase

had Todman not co-signed for it.

¶70     Within four months of purchasing the property, construction began. While the construction

was on-going, Todman cooked and otherwise provided food for Victor and the construction

workers, as well as the family. Victor candidly admitted he never cooked for the family during their relationship. Victor never provided any financial support for either of Todman's children, Thevar or Shane. When the family was renting, Victor and Todman split the rent payments equally. Todman also paid the household expenses for the home, food, phone, water, and cable tv, while Victor paid for his own cell phone, since he considered the phone and cable expenses for the family home to be unnecessary. Additionally, Victor's contribution to supporting his family was only ever contributed when Todman could not cover the entire costs through her wages. As he explained, there was no "standard amount" provided, and he only stepped in when Todman's earnings from tipped wages fell short. He also confirmed that his two stepchildren, his two nephews, and his son with Todman all lived in their family home. Todman was the primary parental contact for the children and helped with their homework.

¶71 Victor also confirmed much of the testimony of Laurie. Laurie had lived with the family and helped with the construction. Victor had assisted Laurie in coming from Guyana. Like Laurie, Victor testified that Todman transported materials to the construction site both before and after the execution of the quitclaim deed. Laurie had known Todman and Victor to be husband and wife when he knew the couple in Tortola. After Laurie had returned to Guyana, Victor had visited and shown him the building plans for the 278 Property. On the plans, both Victor and Todman were listed as the owners. When Laurie had questioned Victor about Todman, Victor explicated they were in an intimate relationship, with Victor referring to Todman as "my girl."

¶72 Laurie never saw Victor purchase or provide food for the workers, of which there were four at the time, but Todman did so regularly, even at night and on weekends. Indeed, Laurie had never seen Victor go to the grocery store. Todman paid the phone, gas, and electrical bills. Likewise, Todman used her vehicle to transport workers and materials to the construction site.

Additionally, Todman worked at the site helping with construction generally and cleaning up at the end of the day. Laurie emphasized that Todman "worked tirelessly like a horse."

¶73    Christian also confirmed that Todman and Victor were in a romantic relationship.[15] He further confirmed that Todman was involved with the construction at the 278 Property and would bring food to the work site, in addition to transporting building materials and helping at the construction site. Also, Thevar, Todman's daughter, testified that she and her brother had regularly read their mother's correspondence and assisted with other reading when they lived in the family home. Thevar had never observed her mother reading a newspaper.

¶74    The bank officer testified that the quitclaim deed was provided to the bank and recorded as part of Victor's application for financing. Victor, when called as an adverse witness in Todman's case, confirmed that Rudolph McCurdy was one witness to Todman's signature on the deed, and Victor, the grantee himself, was the other witness who had signed his name as having witnessed Todman's execution of the deed.

¶75    Finally, Laurie testified that Victor admitted his entire plan to defraud Todman of her interest in the 278 Property by fraudulently inducing her to execute the quitclaim deed. Laurie explained that he had seen the building plans for 278 on one of Victor's prior visits to Guyana and had been told by Victor that Todman was Victor's significant other. On a subsequent visit, Victor confirmed to Laurie that he had informed Todman that her signature was needed to obtain a loan from the bank, but what he had actually given her to execute was a deed transferring to him (Victor) her interest in 278.

---

[15] *See State v. Carswell*, 871 N.E.2d 547, 553 (Ohio 2007) ("'The essential elements of 'cohabitation' are (1) sharing of familial or financial responsibilities and (2) consortium).' . . . 'Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. [I]t is a person's determination to share some measure of life's responsibilities with another that creates cohabitation." (quoting *State v. Williams*, 683 N.E.2d 1126 (Ohio 1997))).

¶76　This evidence supports the trial court's findings of fact 1-10 and 14, which were findings regarding the parties' backgrounds. Additionally, the trial court found that Victor took Todman to the 278 Property and afterward they chose to buy it together, which finding, no. 15, is supported by the evidence. Finding 16, "Victor's credit was not sufficient to obtain a loan, but Todman's credit allowed the couple to obtain bank financing and they purchased No. 278 . . . and Todman and Victor took title to that property.", is also supported by the evidence. Similarly, the court found that Todman attended the closing for 278. Likewise, finding 19, "In 2003, Victor approached Todman at home and asked her to sign papers so they could apply to the bank for a construction loan for No. 278.", is supported by the evidence. These examples sufficiently demonstrate the nature of the findings supported by the evidence.

¶77　As to the details of the fraud itself, Todman testified that, having already obtained a loan for the purchase of the 278 Property and taken title jointly (Todman having attended the closing for the purchase of this property), Victor told Todman that he had obtained a loan for the construction of the building on the property but needed Todman's signature on certain documents in order to finalize the matter with the bank. The Superior Court could reasonably credit Todman's testimony that one day, while she was mopping the bedroom floor, Victor came to her with a document and explained that, in order to obtain a loan for construction on 278, her signature was needed. The Superior Court could also reasonably credit Todman's testimony that Victor told her that her presence at the closing for this new construction loan was unnecessary, as she had attended the closing for the purchase loan and executed all the documents needed then.

¶78　Victor misrepresented both the nature of the document to be signed and the lack of a need for Todman's presence at the closing for the construction loan. As the document was a deed transferring Todman's interest, and not a loan application or other document involving finances,

this representation was both fraudulent and material. Furthermore, Todman expressly testified that she would never have executed the document had she been told she was giving Victor her entire interest in the 278 Property, establishing her reliance. Additionally, given the value of the property involved, it is reasonable to conclude that nobody would have given away their interest in such real property without substantial compensation, thus allowing the inference that the representation that the document was other than a quitclaim deed was material to Todman's inducement to the contract.

¶79    The foregoing was certainly substantial testimony from which a finder of fact could conclude that Todman was fraudulently induced into executing the quitclaim deed, thus rendering the deed void ab initio, and this evidence established the first three elements of fraud in the inducement by clear and convincing evidence. *See Wilkinson*, 70 V.I. at 921-22 (noting that fraud is rarely susceptible to direct proof and explaining that, "[i]n a case such as this, where proof is based upon the cumulative probative value of various discrete pieces of circumstantial evidence, it is critically important . . . to clearly examine . . . any and all evidence presented," and ultimately concluding that the facts presented were sufficient to raise the issue and remanding for determination of fact in the first instance (citing *Wessinger v. Wessinger*, 56 V.I. 481, 488-89 (V.I. 2012))). The above brings us to the core substance of Victor's appeal; Victor fervently entreats the Court to find that Todman's reliance upon Victor at the time of the execution of the quitclaim deed was unreasonable as a matter of law thus requiring reversal of the Superior Court's judgment.

   2.   **Because There was Testimony and Documentary Evidence Corroborating Todman's Testimony, and the Superior Court, as Finder of Fact, was Responsible for All Credibility Determinations, Todman Established a Claim of Fraud in the Inducement to the Execution of the Quitclaim Deed, and, as a Matter of Law, Todman's Reliance and Trust in Victor was Reasonable.**

¶80    As to the element of reasonable reliance, there are two possible courses this Court could take in addressing this issue in the context presented. First, we could adopt a different cause of action requiring a plaintiff to plead and prove a "confidential relationship" resulting in the dominant party in that relationship obtaining something of value by exploitation of that relationship, including fraudulent inducement of a contract.[16] Alternatively, we could consider the principles of law underlying the exploitation of a confidential relationship and apply them to the element of "reasonable reliance" as factors relevant to be considered in determining whether a claim of fraud in the inducement to the execution of a contract has been established by clear and convincing evidence.

¶81    It is noteworthy that "fraud in the inducement can serve as both a basis for tort liability and as grounds for rescinding a contract," and "the test to be applied in the case [of a claim of fraudulent inducement to a contract] to determine whether a [party] is to be relieved of [their] contract by reason of any alleged fraudulent misrepresentation is the same as that applied in action of tort for deceit."[17] *Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 224 (1st Cir. 2003)

---

[16] This would result in the judgment being reversed for the Superior Court's failure to conduct multiple Banks Analyses and because the Superior Court granted an unavailable remedy (imposition of a constructive trust) for Todman's successful claim of fraud in the inducement to a contract, a clear abuse of discretion and an obvious legal error.

[17] Historically, fraud in the inducement of a contract was a claim that a contract is void founded in law with the remedy being rescission of the void fraudulent contract placing the parties in the same position they were in prior to the fraudulent inducement (and entitling the injured party to relief such as ordering the guilty part to execute a quitclaim deed transferring title back to the injured party and further ordering the guilty party to record that deed and bear all such associates costs). In contrast, an equitable claim of unjust enrichment arising from the exploitation of a confidential relationship gave rise to constructive trust. Given the merger of law and equity over a century ago, it is questionable if these remain two separate causes of action. *See Walters*, 58 V.I. at 404 ("It is a well-known fact that the distinction between courts of law and courts of equity have long been abolished, and that actions in law and actions in equity have 'been merged into one form of action—the civil action." (quoting *Three Keys Ltd. v. SR Utility Holding Co.*, 540 F.3d 220, 229 n.9 (3d Cir. 2008))); *Greenberg v. Tomlin*, 816 F. Supp. 1039, 1052 (E.D. Pa. 1993) ("When a contract is induced by fraud, the injured party has a choice of alternate remedies: he may either rescind the contract or affirm it and maintain an action in deceit for damages."). It would seem that, under the current state of the law and given this Court's holdings in *Banks* and *Connor*, such a claim in reality only sounds in fraudulent inducement to a contract giving rising to both remedies at law and equitable remedies. Emphatically, "the whole tendency of our

(citing *Denton v. Utley*, 86 N.W.2d 537, 541-42 (Mich. 1957); *Yorke v. Taylor*, 124 N.E.2d 912, 914-15 (Mass. 1955); W. PAGE KEATON, PROSSER & KEATON ON TORTS § 105 (5th ed. 1984)); *Harris v. Delco Prods.*, 25 N.E.2d 740, 742 (Mass. 1940). And, a grant of an interest in land by deed is a contract. *Dartmouth College*, 17 U.S. (4 Wheat.) at 590 & n.11. Additionally, the trial court expressly rejected Todman's tort claim and disposed of this matter on the basis of fraudulent inducement to a contract. As result of this procedural history considered in light of the substantive law, Todman's claim of fraud in the inducement sounded in contract, and the proper remedy was restoration of the parties to their legal positions prior to the execution (and recording) of the void deed—generally accomplished by ordering the offending party to record a corrective deed and bear all costs of such execution and recording. *See Kenda Corp.*, 329 F.3d at 225 (noting that, after rescission, no contract exists, and the parties are restored to the same position they would have been in but for the fraudulent inducement).

¶82    In contrast, the remedy of imposition of a constructive trust would generally not be legally justified under the circumstances of this case because that remedy is awarded as relief based upon a finding of unjust enrichment. *E.g.*, *Francois*, 599 F.2d at 1291. Finally, the parties can be restored to their positions as of just prior to the execution of the fraudulently obtained deed, thus

---

decisions is to require a plaintiff to try [their] whole cause of action and [their] whole case at one time. [A party] cannot even split up claim[s]; and, a fortiori, [a party] cannot divide the grounds of recovery." *United States v. California & Ore. Land Co.*, 192 U.S. 355, 358 (1904) (citing *Trask v. Harford & New Have R.R. Co.*, 84 Mass. 331 (Mass. 1861); *Fetter v. Beale*, (1701) 91 ER 1122; Freeman, Law of Judgments §§ 238, 241 (4th ed. 1898)). A plaintiff is "bound then to bring forward all grounds that it ha[s] for declaring [relief], and when the [relief is finally adjudged], [i]s barred as to all by the decree." *California & Ore. Land Co.*, 192 U.S. at 358-59 (citing *Bienville Water Supply Co. v. Mobile*, 186 U.S. 212, 216 (1902); *Werlein v. New Orleans*, 177 U.S. 390 (1900); *Hoseason v. Keegen*, 59 N.E. 627 (Mass. 1901); *Sayers v. Auditor General*, 82 N.W. 1045 (Mich. 1900); *Wildman v. Wildman*, 41 A. 1 (Conn. 1898); *Foster v. Hinson*, 39 N.W. 682 (Iowa 1888); *State v. Brown*, 1 A. 54 (Md. 1885); *Boyd v. Boyd*, 65 N.Y.S. 859 (N.Y. App. Div. 1900); *Shaffer v. Scuddy*, 14 La. Ann. 576 (La. 1859 ); *Henderson v. Henderson*, (1843) 67 ER 313, 115). This is an issue to be addressed by the judges of the Superior Court in cases of first instance, and as the Superior Court expressly disclaimed that its judgment was based upon a claim of unjust enrichment, we address only the question of proof of reasonable reliance for a claim of fraudulent inducement to the execution of a contract.

eliminating any need for an award of damages. *See V.I. Port Auth. v. Callwood*, 2014 WL 905816 (V.I. Super. Ct. 2014) (noting that rescission would be inappropriate if the parties could not be restored to their prior positions). Therefore, the better course in matters involving a claim of fraud in the inducement to the execution a deed is to consider the circumstances of the parties' relationship in determining whether such reliance is reasonable.[18] Importantly, whether the agreement is express "or implied is of no legal consequence. The only difference is the nature of the proof of the agreement. Parties entering this type of relationship usually do not record their understanding in specific legalese. Rather, as here, the terms of their agreement are to be found in their respective versions of the agreement, and their acts and conduct in light of the subject matter and the surrounding circumstances." *Kozlowski v. Kozlowski*, 403 A.2d 902, 906 (N.J. 1979) (citing *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946); *St. Paul Fire Co. v. Indemnity Ins. Co. of N.A.*, 148 A.2d 825 (N.J. 1960); *West Caldwell v. Caldwell*, 138 A.2d 402 (N.J. 1958); 1 SAMUEL WILLISTON, THE LAW OF CONTRACTS § 3, at 8-12 (3d ed. 1957); 1 ARTHUR L. CORBIN, CONTRACTS § 18, at 39-43 (1963)).[19]

¶83    Ultimately, reasonable reliance is a fact intensive inquiry requiring a court to consider the historic relationship of the parties, the reliance of one party upon the other, the relative business capacities of the parties (or lack of such capacity), the readiness of one party to follow the other's

---

[18] This also appears to be what the Superior Court did in substance, although its conclusions of law are somewhat unclear. *Rivera-Moreno*, 61 V.I. at 312 ("[T]he substance and function of a Superior Court order controls over the form." (citing *In re Drue*, 57 V.I. 517, 527–28 (V.I. 2012))); *see Balboni v. Ranger Am. of the V.I., Inc.*, 70 V.I. 1048, 1055 n.4 (V.I. 2019) (noting that it is the content and substance that controls over the form or title (citing *Hughley v. Gov't of the V.I.*, 61 V.I. 323, 333 (V.I. 2014); *Island Tile & Marble, LLC v. Bertrand*, 57 V.I. 596, 611-12 (V.I. 2012))); Harlan F. Stone, *The Common Law of the United States*, 50 HARV. L. REV. 4, 10 (1936) ("If our appraisals are mechanical and superficial, the law which they generate will likewise be mechanical and superficial, to become at last but a dry and sterile formalism.").

[19] *See also Kinnison v. Kinnison*, 627 P.2d 594, 598 (Wyo. 1981) (Rooney, J., dissenting) ("An implied-in-fact contract . . . is a true contract in which the agreement is expressed by conduct rather than by words." (citations omitted)).

guidance in complicated transactions, etc. *Malpere v. Miraftabi Revocable 2004 Trust*, 426 F.

Supp. 123, 134 (D.V.I. App. Div. 2019) (quoting *Ross*, 58 V.I. at 302-06); *cf. Estate of Skepple v.*

*Bank of N.S.*, 69 V.I. 700, 739 (V.I. 2018) (explaining that due or reasonable diligence is "a

mutable concept that varies according to the facts and derives its form from both context and by

comparison to other standards such as excusable neglect" (citing authorities)). Therefore, as a

matter of factual determination, consideration of factors used to determine whether an intimate

relationship has been exploited are relevant to a determination of reasonable reliance and include

the unfairness of the resulting bargain, the unavailability of independent advice, and the

susceptibility of the person persuaded. *Malpere*, 426 F. Supp. at 134 (quoting *Ross*, 58 V.I. at 302-

06).

¶84    This conclusion is further validated by consideration of our holding in *Wilkinson* that, "if

a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation

by the other party upon which the recipient is justified in relying, the contract is voidable by the

recipient," a rule that would require consideration of the nature of the parties' relationship. 70 V.I.

at 908-09 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 164 (1981), and citing *Lempert*, 26

V.I. at 342; *Connor v. Connor*, 65 V.I. 3, 3-4 (V.I Super. Ct. 2011); *Colon v. Gremer Dev. Co.*, 28

V.I. 83, 87 (V.I. Super. Ct. 1993); *Jackson v. Smith*, 19 V.I. 361, 365-68 (V.I. Super. Ct. 1983);

*Homer v. Lorillard*, 6 V.I. 645, 652 (V.I. Super. Ct. 1968); *Castolenia v. Crafa*, No. ST-13-CV-

243, 2014 WL 239427, at *6 (V.I. Super. Ct. Jan. 15, 2014) (unpublished)).[20]

---

[20] It is worth further noting that, in footnote 2 in *Wilkinson*, we rejected two cases that had conflated the elements of the common law tort of fraud with the elements of a claim for fraud in the inducement to a contract because the party had sought rescission of the contract, not an award of damages. In this case, the same request was made for rescission of the contract, i.e., the deed, and no claim of damages was made.

¶85    Furthermore, other courts have acted in this exact manner in determining whether a party has reasonably relied on a fraudulent representation inducing them to enter[21] a contract. *E.g., Kenda Corp.*, 329 F.3d at 226-27 (considering the plaintiff's reliance in terms of the business relationship that had developed between the parties); *Greenberg v. Tomlin*, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993) ("Although there are no hard and fast definitions of what constitutes reasonable reliance, the degree of sophistication of the parties and the history, if any, behind the negotiation process are relevant factors in ascertaining reasonableness" (relying upon *Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Investments*, 951 F.2d 1399 (3d Cir. 1991))); *G&M Oil Co. v. Glenfield Financial Corp.*, 782 F. Supp. 1085 (D.M.D. 1991); *In re Health Risk Management, Inc.*, 319 B.R. 181, 191 (Bankr. D. Minn. 2005) (noting that reasonable reliance is a question of fact but that the guilty party "cannot escape liability by claiming the other party ought not to have trusted" the guilty party (citing *Davis v. Re-Trac Mfg. Corp..*, 149 N.W.2d 37, 39 (Minn. 1967))); *see Merchants Comm'l Bank v. Oceanside Village, Inc.*, 64 V.I. 3, 7 nn.56-57 (V.I. Super. Ct. 2015) (noting that there is no substantive difference between reasonable and justifiable reliance (citing *Masingill v. EMC Corp.*, 870 N.E.2d 81, 88 (Mass. 2007); *Van Der Stok v. VanVoorhees*, 866 A.2d 972, 975 (N.H. 20055))).

¶86    Victor asserts that—assuming the facts (as Todman told them) to be true—"given the stormy nature of their relationship, the importance of the information presented to her, and the fact that her two teenage children, who she relied on routinely to have documents read to her, were

---

[21] *See generally Peppertree Terrace v. Williams*, 52 V.I. 225, 241 (V.I. 2009) (noting that a contract can be oral, written, or inferred from conduct); *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 212 (6th Cir. 2019) ("A plaintiff may . . . establish reasonable reliance based on a defendant's oral representations." (citing *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464 (Ky. 1999); *Brown v. Louisville Jefferson Cty. Redevelopment Auth. Inc.*, 310 S.W.3d 221 (Ky. Ct. App. 2010); *Oliver v. J.J.B. Hillard, W.L. Lyons, Inc.*, No. 2010-CA-001138-MR, 2013 WL 762593 (Ky. Ct. App. Mar. 1, 2013))).

only a few feet away," "it was unreasonable for Todman to rely on Victor's alleged

misrepresentation."[22] Through this argument, Victor entreats this court to consider his relationship

with Todman. Therefore, we consider whether the facts found by the trial court, as a matter of

law, establish that Todman's reliance upon Victor's representations was reasonable.

### a. Todman's Actions Were Reasonable in Light of the Long-standing, Family Relationship She and Victor had Established and in Further Consideration of her Lack of Ability to Read English and Lack of Education Limiting her Understanding of Complex Transactions.

¶87    As reasonable reliance is fact-intensive and context-specific, there are few broad rules of

law that can be articulated. *Browne*, 66 V.I. at 336 ("The existence of reasonable reliance and

detriment 'depends upon the facts of each particular case.'" (citations and internal quotation marks

omitted)); *People v. Humphrey*, 921 P.2d 1, 9 (Cal. 1996) ("'To effectively present the situation

as perceived by the [victim], and the reasonableness of her fear, [they] have the option to explain

[their] feelings to enable the jury to overcome stereotyped impressions about women who remain

in abusive relationships.'" (quoting *State v. Allery*, 682 P.2d 312, 316 (Wash. 1984))); *United

States v. Nwoye*, 824 F.3d 1129, 1137 (D.C. 2016) (Victims "in battering relationships are often

'hypervigilant to cues of impending danger and accurately perceive the seriousness of the situation

before another person who had not been repeatedly abused might recognize the danger.' Remarks

or gestures that may seem harmless to the average observer might be reasonably understood to

presage imminent and severe violence when viewed against the back drop of the batterer's

particular pattern of violence." (quoting Lenore E.A. Walker, *Battered Women Syndrome and Self-*

---

[22] In addition to the following analysis, Victor's argument rests largely on the false premise that the facts found by the trial court are the facts he asserts in this argument. However, the Superior Court found that Victor fraudulently induced Todman's signature, a conclusion that implicitly found Todman's version of events to be the credible version, and we must make all inferences in favor of the prevailing party when the trial court's findings of fact are not clearly erroneous. In fact, it was impossible for the trial court to have ruled as it did if it had found this aspect of Victor's testimony credible.

*Victor v. Todman*                                  2024 VI 18
S. Ct. Civ. No. 2018-0045
Opinion of the Court
Page 43 of 57

*defense*, 6 NOTRE DAME J.L. ETHICS & PUB. POL'Y 321, 324 (1992))). Simply, "the outer limit of this doctrine requires only that the relied-upon statement not be 'preposterous or palpably false.'" *Kenda Corp.*, 329 F.3d at 227 (quoting *Yorke*, 124 N.E.2d at 916, and citing *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 795 (Mass. 2003); *Zimmerman v. Kent*, 575 N.E.2d 70, 71 (Mass Ct. App. 1991); PROSSER & KEETON ON TORTS, § 108)); *In re McKenney*, 953 A.2d 336, 343 (D.C. 2008) (stating that it is unreasonable to rely upon a "statement that is 'preposterous or obviously false'" (quoting 37 AM JUR. 2D *Fraud & Deceit* § 239, at 265 (2001))). Furthermore, without question, "'where a defendant has willfully made false representations with intent to deceive he is not relieved of liability because of his victim's lack of diligence.'" *Id.* (quoting *Yorke*, 124 N.E.2d at 916)); *see In re McKenney*, 953 A.2d at 343 (noting that failure to investigate does not make reliance unreasonable unless the facts establish that the person claiming fraudulent inducement failed to act in good faith according to standards of fair dealing (quoting authorities)). Lastly, reasonable reliance is a factual inquiry requiring consideration of all relevant facts including, inter alia, the relationship of the parties, their past dealings, the capacity of the person deceived, the experience of the person deceived, and the circumstances under which the fraudulent inducement occurred. *In re Health Risk Mgmt., Inc.*, 319 B.R. at 191. We, therefore, turn to our consideration of the parties' relationship and the individual characteristics of Todman and Victor, as well as the circumstances (as found by the trial court) under which Todman executed the quitclaim deed.

### i. The Parties' Relationship

¶88      As to their relationship, both parties testified that they lived in a meretricious relationship,[23]

holding themselves out as husband and wife for more than a decade, including during all times

material to this case. *See In re Marriage of Lindsey*, 678 P.2d 328, 331 (Wash. 1984) ("Courts

must 'examine the meretricious relationship and the property accumulation and make a just and

equitable disposition of the property. . . . Factors to consider [include] continuous cohabitation,

duration of the relationship, purpose of the relationship, and the pooling of resources and services.

. . . Courts should examine each case on its facts." (citations omitted)).[24]    When considering the

nature of their relationship, we consider "whether the parties 'have functioned similarly to the

members of formally recognized family relationships,' such as marriage.   Generally, the legal

consequences flowing from [functional recognition of non-martial family units] fall within the

scope of private law (reciprocal rights and obligations) . . . ."   Palazzo, *The Strange Pairing:*

*Building Alliances Between Queer Activists and Conservative Groups to Recognize New Families*,

25 MICH. J. GENDER & L. 161, 180 (2018) (quoting Robert Leckey, *Families in the Eyes of the*

*Law:  Contemporary Challenges and the Grip of the Past,* 15(8) IRPP CHOICES 1, 3 (2009)).  While

Victor disputes the ultimate conclusion to be drawn from the reality of the parties' relationship,

---

[23] *See generally Connell*, 898 P.2d at 834 (defining a meretricious relationship); *see also Ex parte Nielsen*, 131 U.S. 176, 185-86 (1889) ("Cohabitation . . . is a living or dwelling together as [sposues]." (quoting *In re Snow*, 120 U.S. 274, 281 (1887))); *In re Snow*, 120 U.S.at 281 ("Cohabiting [is a person] living in the same house with [a person they] had theretofore acknowledged as [their spouse], and eating at their respective tables, and holding them to the world by their language or conduct, or both, as [their spouse]."); *Morey v. Commonwealth*, 108 Mass. 433, 436 (Mass. 1871) ("Cohabitation . . . did require proof that they dwelt or lived together." (citing *Commonwealth v. Calef*, 10 Mass. 153 (Mass. 1813))); *Beckman v. Mayhew*, 122 Cal. Rptr. 604, 605 n.1 (Cal. Ct. App. 1975) ("non-marital family relationship" means two people's "indefinitely continued assumption of family life without a marriage ceremony and without good faith belief they are married"); *e.g.*, *Walters*, 58 V.I. at 401–03 ("Although legal title to the Estate Nazareth property is not held in Parrott's name, her contributions to the maintenance of the property over the years afforded her an equitable claim in the property.").

[24] *See also, e.g., Beal v. Beal*, 577 P.2d 507, 510 (Or. 1978); *Traver v. Naylor*, 268 P. 75, 78 (Or. 1928); *In re Thornton's Estate*, 499 P.2d 864, 867-68 (Wash. Ct. App. 1972); *Humphries v. Riveland*, 407 P.2d 967, 979-80 (Wash. Ct. App. 1965) (citing *Knoll v. Knoll*, 176 P.22 (Wash. 1918)); *McHenry v. Smith*, 609 P.2d 855, 857-58 (Or. Ct. App. 1980).

his testimony (as well as Todman's and that of other witnesses) establishes that he and Todman operated as a family unit comingling resources and mutually supporting each other in an endeavor to build a life together that would be more productive and successful than either could have done individually. *See In re Marriage of Stice*, 79 P.2d 1020, 1028 (Or. 1989) ("'Non-earning spouses who maintain the home, do the cooking and cleaning and raise the children, also contribute to the acquisition of property in a tangible way.'" (citations and internal quotation marks omitted)).[25] It is unquestionable that their relationship was that of intimate partners to a jointly established family unit.

¶89    Furthermore, Victor's own testimony is replete with instances documenting his emotional and financial abuse of Todman during the course of their entire relationship. *See Cesare v. Cesare*, 713 A.2d 390, (N.J. 1998) (The victim's "testimony about defendant's previous threats, intimidation, and abuse. . . could lead the court to conclude that a reasonable victim in plaintiff's situation would have felt [coerced]. Although defendant's words did not contain an explicit threat . . ., the surrounding circumstances were such that the trial court, in the best position to judge the credibility of the witnesses, appropriately found that "plaintiff was right in her . . . feeling threatened." (citations and internal quotation marks omitted)).[26] For example, Victor admitted that

---

[25] Dana Harrington Connor, *Financial Freedom: Women, Money, and Domestic Abuse*, 20 WM. & MARY J. WOMEN & L. 339, 358-60 (2014) ("For some abusers financial control is accomplished through a calculated process of seeking out and nurturing a relationship with an individual of compromised means. Other abusers spend years restricting their partner's access to education, employment, training, contacts, and resources, thereby limiting her ability to secure financial freedom once the abuse beings. . . . Moreover, women in poverty experience multiple vulnerabilities, which have a causal relationship with economic hardship such as single-parenthood, homelessness, diminished social capital, compromised immigration status, and language barriers." (citations omitted)).

[26] *See generally* Arianne Renan Barzilay, *Power in the Age of In/Equality: Economic Abuse, Masculinities, and the Long Road to Marriage Equality*, 51 AKRON L. REV. 323, 328-29 (2017) ("Economic abuse [is using] tactics that control a woman's ability to acquire, use, and maintain economic resources, thus threating her economic security and potential self-sufficiency." (citations omitted)).

Todman executed a quitclaim deed that turned over to him the only valuable asset accumulated during their relationship.   This is the most common form of financial abuse in abusive relationships.[27]   Victor admitted that he attempted to force upon Todman the entire financial burden of the property by "generously" offering to give her the entire property and the entire debt. Again, this situation is among the most common forms of financial abuse designed to make the abused partner panic.  Victor further admitted that he forced Todman to bear every family expense beyond paying the mortgage and taxes and that he used Todman's share of rental income on their most valuable asset, parcel 278, to also pay those expenses; thus, he ensured that Todman was never able to accumulate any wealth or assets during their relationship, again, one of the most common tactics of financial abuse.

¶90    Moreover, Victor admitted that his definition of necessary family expenses was only those expenses that served his needs while coincidentally meeting the needs of his family and members of the household.  For example, Victor cavalierly testified that the home telephone was not a necessary family expense because he had his own cell phone.  Victor further testified that, only after he had exploited Todman's financial, physical, and emotional resources and he had manipulated their finances such that he owned multiple properties free and clear of debt (while he simultaneous overloaded with debt the single property to which Todman had a recorded interest), he then evicted her from the home they had built together and accomplished this by deceit and

---

[27] *See generally* Margaret E. Johnson, *Changing Course in the Anti-domestic Violence Legal Movement: From Safety to Security*, 60 VILL. L. REV. 145, 195 (2015) ("Debt can be coerced in multiple ways, including . . . tricking a partner into signing a quitclaim deed to the home . . . ." (citations omitted)); *e.g., Alderson v. Alderson*, 225 Cal. Rptr. 610, 612 (Cal. Ct. App. 1986) ("Jonne moved from the family home, she said, because Steve 'told me to get out.' Prior to leaving, Jonne signed quitclaim deeds 'for all of the houses.' She said she did so under duress. 'Steve told me that I would never get any property. He would see me dead before I got any of them.' Jonne said she was afraid for her own safety and so she 'just signed the deeds to get out.' Jonne received no payment for signing the deeds."); *Tyranksi v. Piggins*, 205 N.W.2d 595, 597 (Mich. Ct. App. 1973) ("After the man tired of the woman, he brought suit claiming the [family home] was his property . . . ." (citation omitted))).

ambush. With such open admission to a long-term strategy of abuse under oath, any court would

be remiss in failing to remember that

> [i]t is important that courts and attorneys hearing or presenting
> evidence in domestic [abuse] cases be aware that the cycles of
> [abuse] and the power dynamic in abusive relationships can
> dramatically affect the type, quality, and quantity of evidence
> available to the court. . . . Judges and attorneys who have been
> schooled in the dynamics of domestic [abuse] will be best able to
> understand the testimony and judge its credibility. For example,
> frequently [an abuser] will testify about 'justifications' for the
> [abuse] that can provide a fact finder important insight into the
> existence of power and control in the relationship. . . . [Abusers]
> will minimize or deny that the [abuse] occurred. They might attempt
> to explain their behavior, focusing on actions by the victim that
> supposedly caused the [abuse]. . . . [By contrast, w]hen [abused
> partners] present testimony, particularly those who have been
> victimized over a long time, research indicates that they will tend to
> underestimate both the frequency and the severity of the [abuse]
> they experienced. [Similarly,] out of fear of their [abuser's]
> retaliation, [they] will minimize and deny the [abuse], request that
> court proceedings be dismissed, or accept the [abuser's] promise to
> stop further [abuse] from occurring. All of this will flavor the
> evidence presented at trial.

Klein & Orloff, *Providing Legal Protection for Battered Women: An Analysis of State Statutes*

*and Case Law*, 21 HOFSTRA L. REV. 801, 1173 & n.2309 (1993) (citing Anne L. GANLEY,

DOMESTIC VIOLENCE: THE WHAT, WHY AND WHO, AS RELEVANT TO CIVIL COURT CASES, IN

DOMESTIC VIOLENCE IN CIVIL COURT CASES: A NATIONAL MODEL FOR JUDICIAL EDUCATION 23,

33 (Agtuca, et. al. eds., 1992)). The trial court's conclusions that Todman's reliance upon Victor

and that the subsequent actions she took founded upon that reliance were reasonable are supported

by the evidence of the nature of their relationship.

### ii.    Todman's Characteristics

¶91    While Victor, again, relies on a false factual premise—that Todman was perfectly literate

and could read and understand the deed and any other documents presented to her—the trial court's

findings were the opposite and are amply supported by the record. As the Superior Court explicitly found, Todman had only an education comparable to that of a middle school student and lacked the ability to read. Furthermore, in light of the long history of emotional and financial abuse displayed in the record, the trial court's conclusion that Todman's reliance was reasonable is supported by the evidence. Indeed, Victor admitted that, when Todman asked how the couple could afford to purchase the 278 Property, he explained the financing process, and once he did this, Todman agreed the purchase was a good idea. Notably, it does not benefit Victor to claim that Todman's reliance at that time was unreasonable, and he makes no such argument. But, when it would have the legal result of validating the quitclaim deed, Victor asserts that it was preposterous for Todman to accept his representations. Such contradictory factual arguments are of little to no value and lacking in credibility.

¶92    In contrast to Victor's appellate arguments, the Superior Court found that the two had a long and intimate relationship upon which they built both a family and community property to their benefit. Todman lacked education and financial sophistication and relied upon Victor in their business and financial dealings while providing him (and their family) with significant financial and emotional support. Likewise, multiple statements by Victor during his testimony indicate that he exploited his position of power in his relationship with Todman to manipulate her to his ends, the most obvious being when he threatened Todman with unloading all the family expenses upon her under the guise of "generously giving" her the 278 Property.[28] Todman's lack of education and her role as the subservient partner in the relationship—fully documented in this record—amply support the trial court's conclusion that her reliance was reasonable.

---

[28] Angela Littwin, *Coerced Debt: The Role of Consumer Credit in Domestic Violence*, 100 CALIF. L. REV. 951, 982 (2012).

### iii.     The Circumstances of the Execution of the Deed

¶93     As we already noted, Victor's appellate argument assumes that the Superior Court's factual findings are clearly erroneous, but they were not.  As the record reflects, Todman was alone with Victor in the bedroom of their apartment (with only Victor's friend present to serve as a witness) and told that she had to execute the document he handed her (with full knowledge of her inability to read it) and falsely represented that it was a loan document rather than a quitclaim deed. Furthermore, it is established that nobody else was in the apartment at the time.

¶94     In direct contradiction of his claim of the "voluntary" nature of Todman's giving Victor her half of the 278 Property, Victor demonstrated that his efforts fall nothing short of coercion. Victor, having previously testified that Todman "wasn't making no money," "making about $5 or $6 an hour," explains that he was home and took Todman into where he had the deed prepared for her to execute and explained that he "believed it was best Todman take . . . the property right now. The cistern is now poured . . . I think you can manage $238.  I gonna move on."  Predictably, Todman was distressed at the prospect of having to support her children, including Victor's son, when making only $5-6 an hour and suddenly being saddled with the additional expense of a mortgage payment and began "pulling her hair out her head" and begging Victor not to do that. Again, predictably, Victor's response was to "magnanimously" tell Todman, "I said I gonna leave . . . . so I say, well, if you don't want me to leave just take your name off [the property]."[29]

¶95     Victor admits that Todman was distressed, as he testified to Todman having exclaimed to him that she had no idea what to do.  So, again, Victor "magnanimously" told Todman to go to Victor's lawyer so the lawyer could explain to Todman the necessary steps to give her half of the

---

[29] During cross-examination, Victor further described this "voluntary" decision of Todman explaining that he told Todman, "I said, if you are not going to take it take your name off."  Victor specifically testified that these were his exact words at the time stating, "I'm telling you the exact words that I'm saying.  Those are the exact words."

property to Victor. After all this, by Victor's assessment, Todman voluntarily agreed to give him her half of the property at that time because they were not getting along. Now, even if this testimony were to be found credible (a conclusion precluded by the trial court's findings of fact and ultimate disposition), it is clear that Victor coerced Todman into executing the deed by threatening to burden her financially. Todman, faced with the prospect of being homeless with her and Victor's child to care for and making only $5-6 an hour, and given the choice of taking on a mortgage payment for a property containing nothing more than a cistern, chose the alternative to care for her child and accede to Victor's demands.

¶96    Yet again, by Victor's own admission, this all occurred in November 2003, and he and Todman continued to live together for another five years in the same manner as they had since forming a family unit and holding themselves to the public as husband and wife in Tortola in 1997. Victor's actions in this specific regard utterly undermine any credibility in his testimony that he regularly, or ever, offered Todman the money he was obligated to provide. More damningly, this testimony leaves no question that, had the trial court accepted this testimony as credible, any conclusion that Todman's execution of the quitclaim deed was voluntary would be clearly erroneous as unsupported by any record evidence.[30]

¶97    Under these circumstances, especially considered in light of the couple's history presented in the record, Todman's reliance was reasonable. *See In re McKenney*, 953 A.2d at 343 ("Moreover, [the defendant] is hardly in a position to fault [the plaintiff's] acceptance of his assertions when [they] pressed [the plaintiff] vigorously for an immediate decision the face of the

---

[30] *See* 5 V.I.C. § 740(3) ("A witness willfully false in one part of his testimony may be distrusted in others."); 5 V.I.C. § 740(2) (The finder of fact is "not bound to find in conformity with the declarations of any number of witnesses which do not produce conviction in their minds . . . .").

impending demolition [of the property]. On this record, we cannot say as a matter of law that [the

plaintiff's] reliance was unreasonable."); *Kenda Corp.*, 329 F.3d at 227 (holding that even a

sophisticated business person's failure to investigate does not make reliance unreasonable).

### iv. Victor's Credibility

¶98    Moreover, Victor's credibility issues further bolster Todman's version of events and

further support the factual findings and legal conclusions of the trial court. As Laurie's testimony

indicates, Victor was unscrupulous in all his dealings. Victor induced multiple people to come to

work for him and represented that he would hold their compensation in trust and even at times

representing he would turn the money over to the families of the men working for him. Yet, Victor

seems to have uniformly refused to turn over the promised compensation and to have uniformly

pocketed money given to him for delivery to third parties.

¶99    Additionally, Victor undermined his credibility, often offering "convenient" statements

that were at best weakly supported by the evidence and often contradictory to his own testimony

as well as the other evidence before the court.[31]  For example, Victor testified both that, when he

sought to purchase the 278 Property, he took Todman to the property and explained to her how

they could afford the purchase, to which she ultimately agreed and that he "did not get her to agree

to move" and that "she could have come she could have stayed." These two realities cannot exist

simultaneously. If he and Todman were not operating as a family unit in agreement to jointly

comingle resources and provide labor in the joint acquisition of assets, then there was absolutely

no reason for Victor to explain to Todman how the 278 Property could be purchased; indeed, under

---

[31] *See* Klein & Orloff, *Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law*,
21 HOFSTRA L. REV. 801, 1173 & n.2309 (1993) ("Few men, even the most severe [abusers], think of themselves as
men who [abuse] their [partners]. The abuser's tendency to minimize problems is comparable to the denial by alcohol
and drug abusers." (citing GANLEY, *supra* at 33; Adams, *Identifying the Assaultive Husband in Court: You be the
Judge*, 33 BOSTON B.J. 23, 24 (1989))).

such circumstances, there would have been no need for Todman's involvement at all. Yet, Victor testified in detail about Todman's involvement in the purchase.

¶100    Furthermore, while his testimony was initially phrased in such a way as to indicate that Todman strenuously opposed the purchase of the 278 Property, when pressed, Victor explained that Todman actually questioned how they could afford such an expense and, after discussing the finances, readily agreed to jointly purchase the property, co-signing the loan for the purchase. Given the family's financial conditions at the time, Todman's concerns were the height of financial and parental responsibility, not some subterfuge employed to oppose a decision beneficial to the family.

¶101    Similarly, Victor testified that the household expenses were evenly divided. However, when further pressed, it became apparent that Victor's definition of "equal" was, in a word, convenient. While Victor readily asserted this 50/50 split of household expenses, what constituted a household expense worth Victor's 50% contribution was in reality only those expenses Victor wanted to or felt like paying. With five children and four adult workers living with Victor and Todman and Victor admitting that he would be gone from before day break until after 11:30 p.m. every day, he refused to contribute to the expense of a family phone because he deemed it to be an unnecessary expense, explaining "I had a cellphone so I didn't need a home phone." Similarly, cable TV was an unnecessary expense to which he never contributed his earnings or rental earnings from any of the properties. And yet again, Victor conceded that Todman paid for the electricity. Yet, Victor was using 100% of the rental income from 278, of which Todman was entitled to 50%, to pay 100% of the various loans he had obtained. Therefore, he was utilizing Todman's rental income from 278 to pay the mortgage and taxes—thus Victor was only using his personal income to pay 50% of the mortgage—while leaving Todman to cover what was effectively 100% of the

family's expenses, all while she was contributing her time, labor, credit, and finances to the construction, in addition to having her share of rental income exploited by Victor to pay the mortgage and taxes. To term this an even split of the expenses between Victor and Todman is disingenuous at best.

¶102   Likewise, while Victor claimed to contribute to groceries, he admitted there was never a "standard amount" that he contributed, and importantly, he only contributed when Todman's tipped income was so insubstantial as to prevent her from covering the total amount. This assertion reflects Victor's convenient view of what constitutes an even split between two partners in a family unit. Moreover, Victor frankly admitted that he never gave financial support to the upbringing of his two stepchildren, even though they lived in the family home.

¶103   Additionally, Victor's explanations for his paying of both the compensation stated in the deed and his child support obligations were, at best, mendacious. First, Victor claimed he offered Todman $6,000 to purchase her half of the property, but she refused. Then, he claimed he paid her through his contribution toward the purchase of a new vehicle. After contradictory testimony as to these payments, wherein Victor asserted that Todman regularly refused to accept money from him (which Todman denied), Victor confirmed that he was incarcerated twice for violating the domestic violence order, as related to that order's requirement that Victor pay various expenses of Todman. Indeed, Victor confirmed that he had failed to pay child support for an inordinately long period of time, accruing $17,000 in arrearages.[32] Upon attempting to return to St. Thomas from a

---

[32] Deborah Epstein, Margaret E. Bell, Lisa A. Goodman, *Transforming Aggressive Prosecution Policies: Prioritizing Victims' Long-term Safety in the Prosecution of Domestic Violence Cases*, 11 AM. U.J. GENDER SOC. POL'Y & L. 465, 477-78 (2003) ("Even when ordered to provide spousal or child support by the court, many [intimate partner abusers] refuse to make payments or delay doing so for long periods of time." (citing Sarah M. Buel, *Dometic Violence and the Law: An Impassioned Exploration for Family Peace*, 33 FAM. OL.Q. 719, 743 (1999); Anna Marie Smith, *The Sexual Regulation Dimension of Contemporary Welfare Law: A Fifty State Overview*, 8 MICH. J. GENDER & L. 121, 155-56 (2002))).

visit to Guyana, Victor was denied re-entry and denied renewal of his visa until he satisfied that obligation.

¶104    But the truly absurd convenience of Victor's testimony is glaringly exposed and laid bare when considering his testimony. For someone who asserted that he only tolerated Todman's moving to Hospital Ground with him because he cared so much about his child, Victor had no qualms or compunctions about letting his child suffer without financial support to the tune of $17,000, after Victor had evicted Todman from the family home and readily sent his child along with her. Of course, Victor was able to make an entire lump-sum payment of $17,000 of child-support arrearages in order to regain entry to this country. Yet, this "only begs the question, if he was able to pay his arrears . . ., why didn't he? He knew he had an obligation to do so. Yet, the record is devoid of [evidence that Todman took] any action that would permit [Victor] to reasonably assert that he was led to believe that he had been released from the obligation." *Kelman v. Kelman*, 21 V.I. 307, 310 (V.I. Super. Ct. 1985).

¶105    To conclude that this testimony had the overwhelming power to destroy whatever remained of Victor's credibility is an understatement, and such a determination was exclusively within the province of the finder of fact, i.e., in a bench trial, the trial judge. From the outset, Victor's telling of the events leading to his arrest was pure fantasy and fiction. Victor would have had the court believe that he was getting random texts from an unknown number informing him of a medical condition and then went to a self-pay kiosk at a phone store and looked up that number, which magically belonged to his stepdaughter. Then, at his insistence, he and Todman visited the doctor, and the test results showed that he had no infections or diseases. Todman, on the other hand, refused to share her results with him. Victor would have had the court believe, first, that Todman, who Victor admitted was the primary care giver and responsible for the family home housing five

children, somehow contracted a sexually transmitted disease and second, that Victor, who admitted he was, more or less daily, out of the family home from before daybreak until after 11:30 p.m.— and oddly prefaced his entire explanation of this incident by indicating he was working part-time at a KFC at the time—had a clean bill of sexual health.

¶106    Although Victor repeats ad nauseam his assertion that Todman's testimony is uncorroborated—which it is not—it is his testimony that lacks significant corroboration and is internally contradictory.  While Todman's testimony provided a minimum evidentiary factual record, as discussed above, in all material respects Todman's testimony was corroborated.  It is noteworthy that Laurie testified concerning Victor's admission of his plan to fraudulently induce Todman into contracting away her right to a one-half, undivided interest in 278 Hospital Ground, the real property that is at the heart of this controversy.  Likewise, Thevar testified as to Todman's lack of ability to read.  It cannot be said that the credibility determination implicit in the trial court's final judgment is utterly lacking in evidentiary support or irrational, such that it is lacking a rational relationship to the record evidence.  Indeed, had the credibility determination been the other way, the factual support of such a determination would have been seriously questionable.  All factors relevant to the evaluation of whether Todman's reliance upon Victor was reasonable support the conclusion that her actions were, in fact, reasonable, and the trial court's conclusion was not wrong as a matter of law and was not an abuse of discretion.

## D.  The Superior Court's Allocation of the Mortgage Debt was Legally Incorrect and Factually Clearly Erroneous.

¶107    Todman cross-appeals the Superior Court's judgment because, while reciting that Todman is only responsible for her "share of liability on the mortgage," the judgment allocates the entire mortgage to Todman.  Just as she argued in her motion for correction of judgment, which the trial

court denied as moot for lack of jurisdiction because the matter was already before this Court, Todman argues that, as a 50% co-owner, at a maximum, her share of liability is $113,620.58. However, Victor requests that we vacate the trial court's equitable distribution award because the trial court failed "to take the further step of determining each co-tenant's proportionate share of the 278 Property, based on their respective contributions, as shown by the evidence produced at trial." *But see In re Marriage of Massee*, 970 P.2d 1203, 1209-10 (Or. 1999) ("A homemaker [partner] contributes to the acquisition of . . . assets, because the performance of domestic tasks by one [partner] frees the other to devote energy and concentration to other tasks that may generate . . . assets." (citations omitted)). In various ways, detailed extensively above, Todman contributed her finances, labor, time, and emotional support to the development of the 278 Property. The portion of the Superior Court's judgment ignoring all such contribution and placing the burden of the entire mortgage on Todman was an obvious abuse of discretion. Therefore, in this regard, the judgment of the Superior Court is reversed, and on remand the Superior Court is directed, after taking further evidence as to actual contributions and appropriately valuing support contributions, to enter a revised judgment. *See Demming v. Demming*, 66 V.I. 502, 511 (V.I. 2017) ("On remand, the court shall consider [the plaintiff's] unacknowledged contributions and also explain its calculation of [the parties' opposing] interests" in the property.); *Kozlowski*, 395 A.2d at 920; *Sparks v. Sparks*, 485 N.W.2d 893, 897 (Mich. 1992) ("In equity cases it is not enough for the trial court to have acted in a nonarbitrary manner; it must also reach a disposition that is fair and just.").

### III.    CONCLUSION

¶108    The trial court's findings of fact that have been challenged are affirmed. Likewise, the trial court's application of the clear and convincing evidence standard is affirmed. While the proper

acknowledgement and recording of a deed makes it presumptively valid, the evidence established fraud in the inducement by clear and convincing evidence, thus overcoming the presumptive validity of the deed.

¶109    While, as a matter of findings of fact and legal analysis, the trial court was largely correct, in its final application it stopped short of completion. As Victor notes, simply rescinding the deed was not the end of the matter. As Todman recognizes, the rescission had no legal effect beyond returning the parties to the rescinded quitclaim deed to their original positions prior to its execution; that is to say, Victor and Todman each held a one-half, undivided interest in 278 Hospital Ground. There still remained the task of actually determining the equities as to how much of the mortgage encumbers their respective one-half interests. Therefore, the judgment of the Superior Court is partially vacated and the matter is remanded for the sole purpose of determining how much of Todman's undivided half interest in the 278 Property should be burdened, if at all, by the mortgage.

**Dated this 2nd day of April, 2024.**

**BY THE COURT:**

**IVE ARLINGTON SWAN**
Associate Justice

**ATTEST:**
**VERONICA J. HANDY, ESQ.**
**Clerk of the Court**

**By:** _____
**Deputy Clerk II**

**Date:** April 2, 2024